554 So.2d 406 (1989)
Ex parte Norman J. PRESSE, Jr.
(Re Norman J. PRESSE, Jr. v. Lynn C. KOENEMANN and Jean Ann Koenemann).
88-1.
Supreme Court of Alabama.
September 29, 1989.
*407 Steven L. Wise of Hardin & Wise, Northport, for petitioner.
C. Delaine Mountain and Barbara W. Mountain of Mountain & Mountain, Tuscaloosa, for respondents.
JONES, Justice.
Petitioner sought certiorari review of the Court of Civil Appeals' affirmance of the trial court's determination of paternity in a declaratory judgment action. We granted the petition for writ of certiorari.
The salient facts of this case are as follows:
*408 The petitioner, Norman J. Presse, Jr., and respondent Jean Ann (Presse) Koenemann were married in the Parish of Orleans, Louisiana, in 1973. The couple moved to Tuscaloosa, Alabama, in 1975, where they resided until sometime in 1977, when they returned to Louisiana. While living in Tuscaloosa, Jean Ann engaged in an adulterous affair with the second respondent, Dr. Lynn C. Koenemann. After the Presse couple returned to Louisiana in 1977, Jean Ann gave birth to Shelly Rene Presse, the subject of this paternity action. The couple lived together as husband and wife until January 1980, when they were divorced by a final judgment rendered by the 32d District Court, Terrebonne Parish, Louisiana. Custody of the minor child was originally awarded to Mr. Presse. In March 1980, Jean Ann married Dr. Koenemann (the other respondent), and in May 1980, custody of the minor child, approximately age 3, was divided between Mr. Presse and the former wife, with the wife to have primary custody. Mr. Presse was awarded liberal visitation rights, which he fully exercised. As a result of the change in custody, Presse was ordered to pay child support in the amount of $50 per month.
In May 1986, Jean Ann and her second husband, Dr. Lynn Koenemann, filed a verified complaint seeking a declaratory judgment of paternity and filed a petition for modification of the divorce decree. Specifically, the Koenemanns requested the court to rule that the child was conceived and born out of wedlock; that the child is the natural child of Lynn C. Koenemann; that all references in the judgment that associate the minor child with the surname of Presse be stricken; that the minor child legally bear the surname Koenemann rather than the surname Presse; and that all visitation rights granted to Norman J. Presse, Jr., by the District Court of Terrebonne Parish, Louisiana, be suspended pending the requested declaration of paternity.
Upon the Koenemanns' request, the court ordered blood tests of all the parties, which indicated that Presse lacks the red cell antigen N, which is present in the child, Shelly R. Presse, and is absent in Jean Ann. The test also indicated that there is a 99% probability that Koenemann is the biological father of Shelly R. Presse.
Those blood tests were introduced into evidence, along with two other tests. The only tests introduced on Presse's behalf were administered upon Jean Ann, Shelly, and Norman in 1978. Those particular tests indicated that Norman J. Presse could not in any way be excluded as the natural father of Shelly R. Presse. By stipulation of the parties, no expert witnesses were called to testify concerning the results of the tests.
After reviewing all the evidence, the trial court ruled that Koenemann was the biological (natural) father of Shelly. The trial court further ordered the Alabama Bureau of Vital Statistics, upon application by the Koenemanns, to amend the child's birth certificate. The trial court, however, did award Presse occasional visitation privileges. On appeal, the judgment of the trial court was affirmed by the Court of Civil Appeals. 554 So.2d 403.
Because this action was commenced after May 7, 1984, the Alabama Uniform Parentage Act ("UPA"), Code 1975,  26-17-1 et seq. (1986 Repl.Vol.), is applicable. Pertinent provisions of that Act are as follows:
" 26-17-2. Parent and child relationshipÔÇöDefined.
"As used in this chapter, the term `parent and child relationship' shall mean the legal relationship existing between a child and his natural or adoptive parents incident to which the law confers or imposes rights, privileges, duties and obligations. It shall include the mother and child relationship and the father and child relationship. (Acts 1984, No. 84-244, p. 375,  2).
"....
" 26-17-5. Presumption of paternity; rebuttal.
"(a) A man is presumed to be the natural father of a child if:
"(1) He and the child's natural mother are or have been married to each *409 other and the child is born during the marriage....
"....
"(3) After the child's birth, he and the child's natural mother have married, or attempted to marry, each other by a marriage solemnized in apparent compliance with the law although the attempted marriage is or could be declared invalid, and
"a. He has acknowledged his paternity of the child in writing, such writing being filed with the appropriate court or the bureau of vital statistics; or
"b. With his consent, he is named as the child's father on the child's birth certificate; or
"c. He is otherwise obligated to support the child either under a written voluntary promise or by court order;
"(4) While the child is under the age of majority, he receives the child into his home or otherwise openly holds out the child as his natural child; or
"(5) He acknowledges his paternity of the child in a writing filed in accordance with provisions of the legitimation statute.
"(b) A presumption of paternity under this section may be rebutted in an appropriate action only by clear and convincing evidence. In the event two or more conflicting presumptions arise, that which is founded upon the weightier considerations of public policy and logic, as evidenced by the facts, shall control. The presumption of paternity is rebutted by a court decree establishing paternity of the child by another man. (Acts 1984, No. 84-244, p. 375,  5, June 8, 1989.)
" 26-17-6. Action to determine father and child relationship; who may bring action; when action may be brought; stay until birth; adopted children.
"(a) A child, a child's natural mother, or a man presumed to be its father under subdivision (1), (2), or (3) of section 26-17-5(a), may bring an action within five years of the birth of said child for the purpose of declaring the existence of the father and child relationship presumed under subdivision (1), (2), or (3) of section 26-17-5(a); or
"(b) Any interested party may bring an action at any time for the purpose of determining the existence or non-existence of the father and child relationship presumed under subdivision (4) or (5) of section 26-17-5(a).
"(c) An action to determine the existence of the father and child relationship with respect to a child who has no presumed father under section 26-17-5 may be brought by the child, the mother, or personal representative of the child, the public authority chargeable by law with support of the child, the personal representative or a parent of the mother if the mother has died, a man alleged or alleging himself to be the father, or the personal representative or a parent of the alleged father if the alleged father has died or is a minor.
"(d) If an action under this section is brought before the birth of the child, all proceedings shall be stayed until after the birth, except service of process and the taking of depositions to perpetuate testimony.
"(e) If the child has been adopted, an action may not be brought. (Acts 1984, No. 84-244, p. 375,  6.)
" 26-17-7. Style of proceedings; prosecution of proceedings.
"Actions commenced under this chapter shall be in the name of the state of Alabama on relation of the complaining witness or party against the person claimed to be the father or against the person alleged to owe a duty of support as the defendant. The district attorney, special prosecutor or attorney otherwise authorized to represent the state of Alabama shall appear and prosecute all proceedings brought under this chapter. (Acts 1984, No. 84-244, p. 375,  7.)
" 26-17-8. Limitation on liability for education and support; when action for purposes of support may be brought; rights of inheritance and succession.

*410 "(a) The father's liabilities for past education and necessary support are limited to a period of two years next preceding the commencement of an enforcement action under this chapter unless an order of support has been previously entered.
"....
"(c) The provisions of this section and section 26-17-6 do not extend the time within which a right of inheritance or a right to a succession may be asserted beyond the time provided by law relating to distribution and closing of decedents' estates or to the determination of heirship, or otherwise. (Acts 1984, No. 84-244, p. 375,  8.)
" 26-17-9. Nature of actions; rules of procedure; who may testify; other evidence; joinder; pleadings; enforcement of support under criminal code.
"(a) An action under this chapter is a civil action governed by the rules of civil procedure. The mother and child and the alleged father are competent to testify and may be compelled to testify. All of the provisions of sections 26-17-12 and 26-17-13, including those regarding evidence, expert testimony and blood tests, shall apply in actions brought under this chapter. The action brought may be joined with an action for divorce, annulment, separate maintenance or support.
"(b) An action to determine paternity may be commenced upon the complaint of any female who is pregnant with or the mother of a child.
"(c) An action to determine paternity may also be commenced upon the complaint of the child, the person having legal custody of the child or the representative of the public authority chargeable by law with the support of the child.
"(d) A complaint for nonsupport of a child may be commenced by complaint by any party listed in subsections (b) and (c) of this section alleging sufficient facts that the defendant owes a duty of support, provided, that support payments have not been ordered previously pursuant to a decree of divorce. Upon a showing that the child is owed a duty of support by the defendant, such duty may be established pursuant to the requirements of section 26-17-14.
"(e) In addition to the civil action for nonsupport provided by this section, applicable sections of the criminal code are available for enforcement of the child's right of support. (Acts 1984, No. 84-244, p. 375,  9.)
"....
" 26-17-12. Blood tests; selection and compensation of experts; admissibility.
"(a) Upon application of the defendant in a paternity proceeding or any other party to the action, the court shall order the mother, child and defendant to submit to one or more blood tests to assist the court in determining paternity of the child. No such blood test shall be taken before the child reaches the age of six months. Whenever the court orders any such blood test to be taken and any of the persons whose blood is to be taken refuses to submit to the test, such fact shall be disclosed upon the trial, unless good cause is shown for not doing so.
"(b) Any tests shall be made by an expert qualified as an examiner of blood types who shall be approved by the court. The expert may be called by the court or any party as a witness to testify to the blood test results and shall be subject to cross-examination by the parties. The blood test results may be admitted into evidence by the defendant. The blood test results may be admitted into evidence by the state only if the statistical probability of the alleged father's paternity is available.
"....
" 26-17-15. SameÔÇöEnforcement.
"(a) If the existence of the father and child relationship is declared, or paternity or a duty of support has been acknowledged or adjudicated under this chapter, prior law or applicable sections of the criminal code, the obligation of the father may be enforced in the same or other proceedings by the mother, the child, the public authorities that have furnished or may furnish the reasonable expenses of pregnancy, confinement, education, or support, or by any other person, including *411 a private agency, to the extent these expenses have been or are being furnished."[1]
(Emphasis added.)
At this point, it should be noted that Koenemann concedes that his wife, Jean Ann, is barred by the doctrine of res judicata, based on Collier v. State ex rel. Kirk, 454 So.2d 1020 (Ala.Civ.App.1984), from bringing a paternity action, because she was a party to the original divorce and custody judgments.
The dispositive issue, then, is: Does a man claiming to be the father of a child conceived and born during the marriage of its mother to another man have standing under the UPA to initiate an action to establish that he is the father of the child, where the presumed father persists in the presumption that he is the father? Under the facts of this case, we answer this first impression issue in the negative; therefore, we reverse the judgment of the Court of Civil Appeals.
Koenemann insists that, notwithstanding the fact that the child was conceived and born while Jean Ann was married to Presse, the child is presumed to be Koenemann's under  26-17-5(a)(4), for which there is no statute of limitations (citing  26-17-6(b)). Because it is undisputed that, after marrying Jean Ann, he "receive[d] the child into his home," Koenemann argues that it should be presumed, under a literal and isolated reading of  26-17-5(a)(4), that he is the father of Shelly R. Presse. We disagree.
We cannot accept the proposition that our Legislature, in adopting the UPA, intended for a third party to be able to assert his paternity, to the exclusion of a man who was married to the child's mother when the child was conceived and born, simply because the third party has since married the man's divorced wife and, in so doing, allowed the child into his home. That argument does not comport with our understanding of the statute. The cardinal rule of statutory construction is to ascertain and effectuate the intent of the Legislature. If a statute is not ambiguous or unclear, the courts are not authorized to indulge in conjecture as to the intent of the Legislature or to look to consequences of the interpretation of the law as written. Clark v. Houston County Commission, 507 So.2d 902 (Ala.1987).
In considering the application of  26-17-1 et seq., to the facts presented, it should be remembered that the ultimate objective of the UPA is to promote full equality for all children, be they legitimate or illegitimate. H. Krause, The Uniform Parentage Act, 8 Fam.L.Q. 1 (1974). See, also, Krause, Equal Protection for the Illegitimate, 65 Mich.L.Rev. 477 (1967).
"By emphasizing the equality of all children and by according illegitimate children an extensive right to paternal support, the UPA ensures that illegitimate children will no longer be subject to the social and legal discrimination they traditionally have suffered.... Under the UPA, the interests of the illegitimate child are deemed to be paramount to those of the other parties to the proceeding. The interest of the other parties are not completely discounted, but merely subordinated to those of the child."
Comment, Statutes of Limitations In Paternity Proceedings: Barring an Illegitimate's Right to Support, 32 Am.U.L.Rev. 567, 612 (1983).
At first blush, it is understandable, if one reads the various sections independently of the Act as a whole, how a conclusion favorable to Koenemann is possible. If, however, one reads the Act as a whole, a different perception is certain. Section 26-17-5(a) lists the various presumptions of paternity under the Act. At the outset, it is obvious that Presse fits within the very first "presumed father" category, set out in  26-17-5(a)(1). As for Koenemann, he appears not to fit within the presumptive categories defined in  26-17-5(a)(1) or 26-17-5(a)(2), but does possibly fit into a literal *412 reading of  26-17-5(a)(3), because he married the child's mother after the child's birth. It behooves Koenemann, however, to somehow escape the presumptive category defined in  26-17-5(a)(3), because nothing in the record indicates that he complied with any of the three required subparts of  26-17-5(a)(3). Furthermore,  26-17-5(a)(3) carries with it a five-year period of limitations, which had already expired before this action was brought.
It is for this reason, therefore, that Koenemann wishes to be considered as falling within  26-17-5(a)(4). While it is true that Koenemann "received the child into his home" during her minority, it is also true that he did so pursuant to a valid custody order granted to the child's mother by a Louisiana district court. Correspondingly, it would appear quite difficult for Koenemann to hold a child out to be his own when the child carried the last name of Presse and her birth certificate stated that her father was Norman J. Presse. Also, we reiterate that Presse religiously exercised his visitation privileges and never once hinted that he disavowed his paternity of the child.
Similarly, Koenemann's argument that he should be allowed to fit within presumptive category  26-17-5(a)(4) fails when one considers the intent of the Legislature. The presumptions set out in  26-17-5(a)(4) and  26-17-5(a)(5) are both similar to those described in  26-17-5(a)(3), except that  26-17-5(a)(3) explicitly mentions the marriage or attempted marriage of the parties. If this Court interpreted  26-17-5(a)(4) to include married persons, the result would be an avoidance of the five-year limitations period set forth in  26-17-6(a). There is no question that a reading of  26-17-5(a)(4), independent of the remaining categories, would allow Koenemann to fit within that section. On the other hand, a reading of all the categories together makes it clear that  26-17-5(a)(4) is reserved for a man not married to the mother of the child. To hold otherwise would allow a man the opportunity to circumvent the statute of limitations by choosing the presumptive category under which he wishes to proceed. We believe it is unreasonable to assume that the legislature intended such a result.
Being mindful that the UPA espouses principles that seek to protect the sanctity of family relationships by providing a comprehensive statutory network through which a child may enforce its right of support against the presumed father, and because in this case the presumed father ardently wishes to fulfill this objective, we are constrained to hold that Norman J. Presse's presumption of fatherhood takes precedent over any presumption that Koenemann might possess. Even assuming that Koenemann might fit within a presumed father category, it is clear that the presumption of Presse's paternity should prevail.
Moreover,  26-17-5(b) provides that, "In the event two or more conflicting presumptions arise, that which is founded upon the weightier considerations of public policy and logic, as evidenced by the facts, shall control." It is quite apparent that the public policy considerations causing Presse, the husband of the child's mother, to be considered as her father, are much "weightier" than any considerations causing Koenemann (who years later married the child's mother and received the child into his home) to be considered a "presumed father." Thus, even if we accepted Koenemann's argument that he literally fits within the category of "presumed father," it is clear that that presumption in his favor would be transcended by the "weightier" presumption in favor of Presse; it is not logical that two men could be presumed to be the child's father. The presumption in favor of Presse is an ancient one, supported by logic, common sense, and justice.
In so holding, we embrace former Chief Justice Torbert's dissenting opinion in Ex parte Anonymous, 472 So.2d 643 (Ala. 1985), wherein he discussed the applicability of the public policy considerations expressed in the UPA with regard to recognition of one professing to be the biological father:

*413 "The issue in this case is simply one of standing. Does one claiming to be the biological father of a child who was conceived or born during the marriage of the mother and another man have standing to bring a declaratory judgment action to have the child declared illegitimate and himself declared to be the child's father? I do not believe that he has standing.
"For actions commenced since May 7, 1984, the Alabama Uniform Parentage Act, Code 1975,  26-17-1, et seq. (Cum. Supp.1984), provides that certain persons can bring an action to determine paternity. Section 26-17-6(c) provides that a man claiming to be the biological father can seek a determination of a father-child relationship if the child has no presumed father. Here, since the child's presumed father is the husband, the third party would not have standing under the Uniform Parentage Act.... The legislature explicitly chose not to grant standing to one claiming to be the natural father of a child with a presumed father."[2]
472 So.2d at 643-44. (Emphasis supplied.)
In a case cited by Chief Justice Torbert, the Delaware Supreme Court held that a third party did not have standing to seek custody of or visitation with a child born during the marriage of its mother to another man. The Delaware court held that a man has no constitutionally protected interest in a determination of his parental status regarding a child born during the marriage of its mother to another man who has not disavowed the child's legitimacy. Further, the court determined that, even assuming that the one claiming to be father has a constitutionally protected interest, it would be overridden by the competing public interest. The countervailing interest cited by the court was the protection of the child from confusion, torn affection, and the stigma of illegitimacy. Petitioner F. v. Respondent R., 430 A.2d 1075 (Del.1981).
A 1981 Northwestern University Law Review article likewise echoes Chief Justice Torbert's sentiments:
"Pater est quem nuptiae demonstratÔÇö the presumption that the husband of the mother of a child born during marriage is the father of that childÔÇöis often said to be one of the strongest presumptions known to the law. Although the presumption is rebuttable in appropriate circumstances, the Uniform Parentage Act (UPA) provides that it may be challenged only by a child's mother, her husband, or the child itself. Thus, under the UPA, as under the majority of other state statutory schemes, a man claiming to be the biological father of a child born during the marriage of its mother to another is unable to initiate an action to establish paternity."
Note, R. McG. & C.W. v. J.W. & W.W.: The Putative Father's Right to Standing to Rebut the Marital Presumption of Paternity, 76 N.W.U.L.Rev. 669 (1981). See Case Comment, Family Law: Michelle W. v. Ronald W., 39 Cal.3d 354, 703 P.2d 88, 216 Cal.Rptr. 748 (1985) 13 Pepperdine L.Rev. 525 (1986); see, generally, Developments in the LawÔÇöThe Constitution and the Family, 93 Harv.L.Rev. 1156 (1980). Krause, Bringing the Bastard into the Great SocietyÔÇöA Proposed Uniform Act On Legitimacy, 44 Tex.L.Rev. 829 (1966).
Additionally, Professor Harry D. Krause, Professor of Law at the University of Illinois and reporter-draftsman to the Committee on a Uniform Parentage Act of the National Conference of Commissioners on Uniform State Laws, expresses similar beliefs:
"The case of the married mother who brings into the world a child of someone not her husband lies differently. But it is not a difficult case either. The application of the presumption of legitimacy of a child born to a married woman would be in the child's interest in practically all cases. If the mother's husband does not disavow paternity, there is *414 no reason to go after the child's true father. Whatever the current weight of the family protection argument may be, it certainly should prevent the illegitimate father from seeking to assert his claim to a child resulting from his union with a married mother. If, on the other hand, the mother's husband has disavowed paternity, no obstacle lies in the way of pursuing the child's father."
H. Krause, Illegitimacy: Law and Social Policy at 77 (1971).
It is also interesting to note that a Columbia Law Review article, which discussed both the favorable and the unfavorable aspects of "inclusive statutes" (those which grant a man claiming to be the biological father the right to challenge a presumed father's presumption of paternity) and "exclusive statutes" (those which preclude such a man from contesting a presumed father's presumption of paternity), placed Alabama, based on  26-17-6(c), in the "exclusive statute" class. Note, Rebutting the Marital Presumption: A Developed Relationship Test, 88 Colum.L. Rev. 369 (1988).
Presse, from the beginning, challenged Koenemann's standing to assert a claim of paternity. His challenge to Koenemann's standing should have been upheld.
Recently, the United States Supreme Court, in Michael H. v. Gerald D., 491 U.S. ___, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989), addressed a fact situation quite similar to that of the instant case.
The facts in Michael H. were as follows: Carole D. and Gerald D. were married and residing together in California, when Carole engaged in an adulterous affair with Michael H. In May 1981, Victoria D. was born. Gerald was listed as the father on Victoria's birth certificate and he claimed her as his daughter. In October 1981, Gerald moved to New York, while Carole and Victoria remained in California. After Gerald's move to New York, Carole, Michael, and Victoria had blood tests performed at U.C.L.A. Those tests demonstrated a 98.07% probability that Michael was Victoria's biological father. Thereafter, Carole and Victoria went to live with Michael in St. Thomas, in the United States Virgin Islands. There, Michael held Victoria out as his child. They lived with him for three months, from January 1982 through March 1982.
In April 1982, Carole and Victoria, after visiting Gerald in New York, moved back to California and took up residence with yet another man, Scott K. While living with Scott, Carole and Victoria would, from time to time, visit Gerald in New York. In November 1982, Michael served Carole with a petition to establish his paternity and a right to visitation. In March 1983, Carole and Victoria returned to New York and resided with Gerald through June of that year. In the summer of 1983, Carole and Victoria returned to California. From August 1983 through April 1984, Carole allowed Michael to stay with her and Victoria when he was in California. During his visits to California, Michael held Victoria out as his daughter and Victoria called him "Daddy." In April 1984, Carole and Michael signed a stipulation that Michael was Victoria's biological father and that he was entitled to visitation privileges. The stipulation, however, was never finalized. Carole left Michael the next month and subsequently instructed her attorneys not to file the stipulation. In June 1984, Carole and Victoria joined Gerald in New York, where, so far as the Court's opinion discloses, they now live.
Thereafter, both Michael and Victoria, through her guardian ad litem, sought visitation for Michael pendente lite. The trial court ultimately granted Gerald, who had intervened in the action, a summary judgment on the ground that there were no triable issues of fact as to paternity under Cal.Evid.Code  621(a), which provides that a child born to a married woman living with her husband, who is neither impotent nor sterile, is "conclusively" presumed to be a child of the marriage, and that this presumption may be rebutted only by the husband or wife, and then only in limited circumstances. An appellate court affirmed the judgment of the Superior Court, and the Supreme Court of California denied Michael and Victoria's petition for review. *415 See Michael H. v. Gerald D., 191 Cal. App.3d 995, 236 Cal.Rptr. 810 (1987).
On appeal, the United States Supreme Court, in a plurality opinion, affirmed the judgment of the California Court of Appeal. Five Justices agreed, inter alia, that California's conclusive presumption of paternity in favor of a woman's husband did not encroach upon the due process rights of one claiming to be the biological father.
Justice Scalia, author of the plurality opinion, discussed Michael's challenges to the constitutionality of  621:
"[Michael] asserts that requirements of procedural due process prevent the State from terminating his liberty interest in his relationship with his child without affording him an opportunity to demonstrate his paternity in an evidentiary hearing. We believe this claim derives from a fundamental misconception of the nature of the California statute. While  621 is phrased in terms of a presumption, that rule of evidence is the implementation of a substantive rule of law. California declares it to be, except in limited circumstances, irrelevant for paternity purposes whether a child conceived during and born into an existing marriage was begotten by someone other than the husband and had a prior relationship with him. As the Court of Appeal phrased it:
"`"The conclusive presumption is actually a substantive rule of law based upon a determination by the Legislature as a matter of overriding social policy, that given a certain relationship between the husband and wife, the husband is to be held responsible for the child, and that the integrity of the family unit should not be impugned."' 191 Cal.App.3d, at 1005, 236 Cal.Rptr., at 816, quoting Vincent B. v. Joan R. 126 Cal.App.3d [619], at 623, 179 Cal.Rptr. [9], at 10 [1981].
"Of course the conclusive presumption not only expresses the State's substantive policy but also furthers it, excluding inquiries into the child's paternity that would be destructive of family integrity and privacy.
"... A conclusive presumption does, of course, foreclose the person against whom it is invoked from demonstrating, in a particularized proceeding, that applying the presumption to him will in fact not further the lawful governmental policy the presumption is designed to effectuate. But the same can be said of any legal rule that establishes general classifications, whether framed in terms of a presumption or not. In this respect there is no difference between a rule which says that the marital husband shall be irrebuttably presumed to be the father, and a rule which says that the adulterous natural father shall not be recognized as the legal father. Both rules deny someone in Michael's situation a hearing on whether, in the particular circumstances of his case, California's policies would best be served by giving him parental rights....
"Michael contends as a matter of substantive due process that because he has established a parental relationship with Victoria, protection of Gerald's and Carole's marital union is an insufficient state interest to support termination of that relationship. This argument is, of course, predicated on the assertion that Michael has a constitutionally protected liberty interest in his relationship with Victoria.
"... In an attempt to limit and guide interpretation of the Clause, we have insisted not merely that the interest denominated as a `liberty' be `fundamental' (a concept that, in isolation, is hard to objectify), but also that it be an interest traditionally protected by our society. As we have put it, the Due Process Clause affords only those protections `so rooted in the traditions and conscience of our people as to be ranked as fundamental,' Snyder v. Massachusetts, 291 U.S. 97, 105 [54 S.Ct. 330, 332, 78 L.Ed. 674] (1934) (Cardozo, J.). Our cases reflect `continual insistence upon respect for the teachings of history [and] solid recognition of the basic values that underlie our society....' Griswold v. Connecticut, 381 U.S. 479, 501 [85 S.Ct. 1678, 1690, 14 *416 L.Ed.2d 510] (1965) (Harlan, J., concurring in judgment).
"This insistence that the asserted liberty interest be rooted in history and tradition is evident, as elsewhere, in our cases according constitutional protection to certain parental rights. Michael reads the landmark case of Stanley v. Illinois, 405 U.S. 645 [92 S.Ct. 1208, 31 L.Ed.2d 551] (1972), and the subsequent cases of Quilloin v. Walcott, 434 U.S. 246 [98 S.Ct. 549, 54 L.Ed.2d 511] (1978), Caban v. Mohammed, 441 U.S. 380 [99 S.Ct. 1760, 60 L.Ed.2d 297] (1979), and Lehr v. Robertson, 463 U.S. 248 [103 S.Ct. 2985, 77 L.Ed.2d 614] (1983), as establishing that a liberty interest is created by biological fatherhood plus an established parental relationshipÔÇöfactors that exist in the present case as well. We think that distorts the rationale of those cases. As we view them, they rest not upon such isolated factors but upon the historic respectÔÇöindeed, sanctity would not be too strong a termÔÇötraditionally accorded to the relationships that develop within the unitary family....
"Thus, the legal issue in the present case reduces to whether the relationship between persons in the situation of Michael and Victoria has been treated as a protected family unit under the historic practices of our society, or whether on any other basis it has been accorded special protection. We think it impossible to find that it has. In fact, quite to the contrary, our traditions have protected the marital family (Gerald, Carole, and the child they acknowledge to be theirs) against the sort of claim Michael asserts.
"The presumption of legitimacy was a fundamental principle of the common law. H. Nicholas, Adulturine Bastardy 1 (1936). Traditionally, that presumption could be rebutted only by proof that a husband was incapable of procreation or had had no access to his wife during the relevant period. Id., at 9-10 (citing Bracton, De Legibus et Consuetudinibus Angliae, bk. i, ch. 9, p. 6; bk. ii, ch. 29, p. 63, ch. 32, p. 70 (1569)). As explained by Blackstone, nonaccess could only be proved `if the husband be out of the kingdom of England (or, as the law somewhat loosely phrases it, extra quatuor maria [beyond the four seas]) for above nine months....' 1 Blackstone's Commentaries 456 (Chitty ed. 1826). And, under the common law both in England and here, `neither husband nor wife [could] be a witness to prove access or nonaccess.' J. Schouler, Law of the Domestic Relations  225, p. 306 (3d ed. 1882); R. Graveson & F. Crane, A Century of Family Law: 1857-1957, p. 158 (1957). The primary policy rationale underlying the common law's severe restrictions on rebuttal of the presumption appears to have been an aversion to declaring children illegitimate, see Schouler, supra,  225, at 306-307; M. Grossberg, Governing the Hearth 201 (1985), thereby depriving them of rights of inheritance and succession, 2 Kent's Commentaries 175 (1827), and likely making them wards of the state. A secondary policy concern was the interest in promoting the `peace and tranquillity of States and families,' Schouler, supra,  225, at 304, quoting Boullenois, TraitÚ des Status, bk 1, p. 62, a goal that is obviously impaired by facilitating suits against husband and wife asserting that their children are illegitimate. Even though, as bastardy laws became less harsh, `[j]udges in both [England and the United States] gradually widened the acceptable range of evidence that could be offered by spouses, and placed restraints on the "four seas rule" ... [,] the law retained a strong bias against ruling the children of married women illegitimate.' Grossberg, supra, at 202.
"We have found nothing in the older sources, nor in the older cases, addressing specifically the power of the natural father to assert parental rights over a child born into a woman's existing marriage with another man. Since it is Michael's burden to establish that such a power (at least where the natural father has established a relationship with the child) is so deeply embedded within our traditions as to be a fundamental right, the lack of evidence alone might defeat his case. But the evidence shows that *417 even in modern timesÔÇöwhen, as we have noted, the rigid protection of the marital family has in other respects been relaxedÔÇöthe ability of a person in Michael's position to claim paternity has not been generally acknowledged. For example, a 1957 annotation on the subject: `Who may dispute presumption of legitimacy of child conceived or born during wedlock,' 53 A.L.R.2d 572, shows three States (including California) with statutes limiting standing to the husband or wife and their descendants, one State (Louisiana) with a statute limiting it to the husband, two States (Florida and Texas) with judicial decisions limiting standing to the husband, and two States (Illinois and New York) with judicial decisions denying standing even to the mother. Not a single decision is set forth specifically according standing to the natural father, and `express indications of the nonexistence of any ... limitation' upon standing were found only `in a few jurisdictions.' Id., at 579.
"Moreover, even if it were clear that one in Michael's position generally possesses, and has generally always possessed, standing to challenge the marital child's legitimacy, that would still not establish Michael's case. As noted earlier, what is at issue here is not entitlement to a state pronouncement that Victoria was begotten by Michael. It is no conceivable denial of constitutional right for a State to decline to declare facts unless some legal consequence hinges upon the requested declaration. What Michael asserts here is a right to have himself declared the natural father and thereby to obtain parental prerogatives. What he must establish, therefore, is not that our society has traditionally allowed a natural father in his circumstances to establish paternity, but that it has traditionally accorded such a father parental rights, or at least has not traditionally denied them. Even if the law in all States had always been that the entire world could challenge the marital presumption and obtain a declaration as to who was the natural father, that would not advance Michael's claim. Thus, it is ultimately irrelevant, even for purposes of determining current social attitudes towards the alleged substantive right Michael asserts, that the present law in a number of States appears to allow the natural fatherÔÇöincluding the natural father who has not established a relationship with the childÔÇöthe theoretical power to rebut the marital presumption, see Note, Rebutting the Marital Presumption: A Developed Relationship Test, 88 Col.L.Rev. 369, 373 (1988). What counts is whether the States in fact award substantive parental rights to the natural father of a child conceived within and born into an extant marital union that wishes to embrace the child. We are not aware of a single case, old or new, that has done so. This is not the stuff of which fundamental rights qualifying as liberty interests are made.
"... Where ... [a] child is born into an extant marital family, the natural father's unique opportunity conflicts with the similarly unique opportunity of the husband of the marriage; and it is not unconstitutional for the State to give categorical preference to the latter....
"... Here, to provide protection to an adulterous natural father is to deny protection to a marital father, and vice versa. If Michael has a `freedom not to conform' (whatever that means), Gerald must equivalently have a `freedom to conform.' One of them will pay a price for asserting that `freedom'ÔÇöMichael by being unable to act as father of the child he has adulterously begotten, or Gerald by being unable to preserve the integrity of the traditional family unit he and Victoria have established. Our disposition does not choose between these two `freedoms,' but leaves that to the people of California."
491 U.S. at ___, 109 S.Ct. at 2340-46, 105 L.Ed.2d at 103-10. (Emphasis in original.)
Admittedly, this case and the case of Michael H. v. Gerald D., supra, have some factual differences, notably the fact that Michael was not married to and living with the mother and child when he brought his suit seeking visitation rights. Nevertheless, *418 the applicable rules of law are the same. In this case, as in Michael H., the legal question is whether a man has standing to bring an action seeking to declare a child illegitimate and to have himself declared the father of that child. This is not permitted under the UPA, as long as there is a presumed father, pursuant to  26-17-5(a)(1), who has not disclaimed his status as the child's father; consequently, another man, though he later marries the mother and lives with the mother and child, has no standing to challenge the presumed paternity of that child. Put another way, so long as the presumed father persists in maintaining his paternal status, not even the subsequent marriage of the child's mother to another man can create standing in the other man to challenge the presumed father's parental relationship.
The record before us shows that despite divorce, physical separation, and painful assertions that he is not the true father of Shelly, Norman J. Presse has provided her with unconditional love, financial support, and companionship. The Court, therefore, is of the opinion that to sever or curtail this father-child relationship would frustrate the benevolent purpose of the legislative expression of public policy. Koenemann's interest in judicially establishing his claimed biological relationship is outweighed by the substantial state interest in the psychological stability and general welfare of the child and the state's overriding interest in affording legitimacy to children whenever possible, all of which are obvious objectives of Alabama's UPA.
For the above reasons, the judgment of the Court of Civil Appeals is reversed and the cause is remanded for the entry of a judgment consistent with this opinion.
REVERSED AND REMANDED WITH INSTRUCTIONS.
HORNSBY, C.J., and ALMON, SHORES, ADAMS, HOUSTON and KENNEDY, JJ., concur.
STEAGALL, J., concurs in the result.
MADDOX, J., dissents.
MADDOX, Justice (dissenting).
Why does a biological father not have standing to establish his paternity of a child when the mother of the child says he is the father; when the scientific tests show that he is the father; and when he is now married to the child's mother and the child lives in his home and calls him "Daddy"?
The majority's holding is that "so long as the presumed father persists in maintaining his paternal status, not even the subsequent marriage of the child's mother to another man can create standing in the other man to challenge the presumed father's parental relationship." This creates an irrebuttable presumption that the man who was married to the mother of a child born during the marriage is the father of that child even though the evidence shows that he is not the father. Such a presumption sets back the law regarding paternity issues 100 years, and the majority's holding ignores not only the law as it currently exists, but also all the facts of this case as well.
This is an extremely important case, because it governs the marital presumption of legitimacy of a child born during a marriage and the "liberty interest" of a proven biological father to have the relationship he has established declared to be the one that is in the best interest of the child. Because the decision construes provisions of the Alabama Uniform Parentage Act, it will impact greatly upon the rights of children born out of wedlock to receive support from their biological fathers, and will effectively cut off such children's rights to inherit from the estates of their biological fathers, even if they can prove by clear and convincing evidence that they are, in fact, the children of men who were not married to their mothers.
This is a case of first impression, and, unfortunately, it is grounded upon a dissenting opinion of this Court and the misreading of a recent decision of the United States Supreme Court.
The majority states the question presented, as follows: "Does a man claiming to be *419 the father of a child conceived and born during the marriage of its mother to another man have standing under the UPA to initiate an action to establish that he is the father of the child, where the presumed father persists in the presumption that he is the father?"
The majority then concludes that "[u]nder the facts of this case, we answer this first impression issue in the negative."
What are "the facts of this case?" The pertinent facts of this case are as follows: While Norman Presse was married to Jean Ann, Jean Ann had an affair with Dr. Lynn Koenemann. Jean Ann used a birth control device when engaging in sex with Presse, but she did not use birth control when having sex with Koenemann; Jean Ann became pregnant. After Shelly was born, Presse and Jean Ann continued their marriage for about three years. Later, Jean Ann married Koenemann, and at age three Shelly came to live with Jean Ann and Koenemann. The testimony showed that Shelly called Koenemann "Daddy" and called Presse "Norman." After the Koenemanns filed this complaint, blood tests were conducted that proved conclusively that Presse could not be the biological father of Shelly and that there was a 99.32% probability that Koenemann was the father.
The majority does not dispute the conclusiveness of the evidence that shows that the child's biological father is Koenemann. Nevertheless, the majority concludes that Koenemann does not have standing, even though the child is obviously his natural child and has lived with him and her mother (to whom the father is now married), since she was three years of age, is a part of the family unit, and calls him "Daddy," and calls the man to whom her mother was married at the time of her birth "Norman." In reaching this illogical conclusion, the majority necessarily has to rely upon a dissenting opinion of the former Chief Justice of this Court in Ex parte Anonymous, 472 So.2d 643 (Ala.1985), and a 1981 Northwestern University Law Review article that states that "the presumption that the husband of the mother of a child born during marriage is the father of that child... is often said to be one of the strongest presumptions known to the law," and that "[a]lthough the presumption is rebuttable in appropriate circumstances, the Uniform Parentage Act (UPA) provides that it may be challenged only by a child's mother,[3] her husband, or the child itself."[4]
In relying upon the dissenting opinion of Chief Justice Torbert and upon the Northwestern University Law Review article, which state that the natural father has no standing, the majority wittingly or unwittingly refuses to follow decisions of the United States Supreme Court that clearly hold that a natural father has a liberty interest in establishing and maintaining a relationship with his natural child. Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). What is especially disturbing about the majority opinion is its apparent holding that  26-17-6(c) is in the category of "`exclusive statutes' (those which preclude [putative fathers] from contesting a presumed father's presumption of paternity)."[5] Also *420 disturbing is that the majority's opinion interprets Michael H. v. Gerald D., 491 U.S. ___, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989), to say "that California's conclusive presumption of paternity in favor of a woman's husband did not encroach upon the due process rights of one claiming to be the biological father."[6]
In order to fully express my views of what I believe to be the law of this case, I will discuss what I believe are the relevant issues:
1) Did the putative father have standing to bring an action to establish his paternity, and, if so, was his action barred because it was not timely filed?
2) Did the putative father prove that he was the father by "clear and convincing" evidence, thereby rebutting the marital presumption of legitimacy of the child?
3) When there are two or more conflicting presumptions of paternity under the Alabama Uniform Parentage Act, what are the "weightier considerations of public policy and logic, as evidenced by the facts," and what standard should be applied in determining which are the weightier considerations of public policy and logic?

I
First, I address the question of whether Koenemann had standing.[7] Because this action was commenced after May 7, 1984, the Alabama Uniform Parentage Act, Code 1975,  26-17-1, et seq. (1986 Repl.Vol.) ("AUPA"), is applicable.[8] Pertinent provisions of that act are as follows:
" 26-17-2. Parent and child relationshipÔÇöDefined.
"As used in this chapter, the term `parent and child relationship' shall mean the legal relationship existing between a child and his natural or adoptive parents incident to which the law confers or imposes rights, privileges, duties and obligations. It shall include the mother and child relationship and the father and child relationship. (Acts 1984, No. 84-244, p. 375,  2).
"* * * * *421 " 26-17-5. Presumption of paternity; rebuttal.
"(a) A man is presumed to be the natural father of a child if:
"(1) He and the child's natural mother are or have been married to each other and the child is born during the marriage, or within 300 days after the marriage is terminated by death, annulment, declaration of invalidity, or divorce, or after a decree of separation is entered by a court;
"(2) Before the child's birth he and the child's natural mother have attempted to marry each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and
"a. If the attempted marriage may be declared invalid only by a court, the child is born during the attempted marriage, or within 300 days after the termination of the attempted marriage by death, annulment, declaration of invalidity, or divorce; or
"b. If the attempted marriage is invalid without a court order, the child is born within 300 days after the termination of cohabitation;
"(3) After the child's birth, he and the child's natural mother have married, or attempted to marry, each other by a marriage solemnized in apparent compliance with the law although the attempted marriage is or could be declared invalid, and
"a. He has acknowledged his paternity of the child in writing, such writing being filed with the appropriate court or the bureau of vital statistics; or
"b. With his consent, he is named as the child's father on the child's birth certificate; or
"c. He is otherwise obligated to support the child either under a written voluntary promise or by court order;
"(4) While the child is under the age of majority, he receives the child into his home or otherwise openly holds out the child as his natural child; or
"(5) He acknowledges his paternity of the child in a writing filed in accordance with provisions of the legitimation statute.
"(b) A presumption of paternity under this section may be rebutted in an appropriate action only by clear and convincing evidence. In the event two or more conflicting presumptions arise, that which is founded upon the weightier considerations of public policy and logic, as evidenced by the facts, shall control. The presumption of paternity is rebutted by a court decree establishing paternity of the child by another man. (Acts 1984, No. 84-244, p. 375,  5.)
" 26-17-6. Action to determine father and child relationship; who may bring action; when action may be brought; stay until birth; adopted children.
"(a) A child, a child's natural mother, or a man presumed to be its father under subdivision (1), (2), or (3) of section 26-17-5(a), may bring an action within five years of the birth of said child for the purpose of declaring the existence of the father and child relationship presumed under subdivision (1), (2), or (3) of section 26-17-5(a); or
"(b) Any interested party may bring an action at any time for the purpose of determining the existence or non-existence of the father and child relationship presumed under subdivision (4) or (5) of section 26-17-5(a)."
Respondent Lynn C. Koenemann argues that, notwithstanding the fact that the child was conceived and born while Jean Ann was married to Presse, the child is presumed to be Koenemann's under  26-17-5(a)(4). Koenemann argues that because it is undisputed that after marrying Jean Ann, he "receive[d] the child into his home," it should, therefore, under a literal reading of  26-17-5(a)(4), be presumed that he is the father.
Although  26-17-7 provides that actions commenced under Alabama's Uniform Parentage Act shall be in the name of the state of Alabama on relation of the complaining *422 witness or party, I, like the majority, consider only the issues raised by petitioner by applying the provisions of the AUPA.[9] Based on all that is before us, I am of the opinion that the Court of Civil Appeals correctly determined that Koenemann had standing.[10]Anonymous v. Anonymous, 472 So.2d 640 (Ala.Civ.App.1984); writ quashed, 472 So.2d 643 (Ala.1984).[11]

II
Presse's second reason for asserting that the Court of Civil Appeals erred is his argument that Koenemann's claim, even assuming he has a claim, is barred by the five-year statute of limitations set out in  26-17-6(a), which provides that "[a] child, a child's natural mother, or a man presumed to be its father under subdivision (1), (2) or (3) of section 26-17-5(a), may bring an action within five years of the birth of said child for the purpose of declaring the existence of the father and child relationship presumed under subdivision (1), (2) or (3) of section 26-17-5(a)." Presse's argument is that if Koenemann has standing at all it is under the provisions of subsection (3) of section 26-17-5(a), which provides that a man is presumed to be the natural father if "(3) [a]fter the child's birth, he and the child's natural mother have married, or attempted to marry, each other by a marriage solemnized in apparent compliance with the law although the attempted marriage is or could be declared invalid." Obviously, Koenemann could fit this classification, but is this the only classification he fits? The trial court and the Court of Civil Appeals said it was not and held that Koenemann's right of action as a "presumed father" was maintainable under the provisions of  26-17-5(a)(4), because the evidence showed that "while the child was under the age of majority, he received the child into his home or openly held out the child as his natural child."[12] I agree with that court. Petitioner has failed to show that the Court of Civil Appeals erred in determining that Koenemann's action was properly maintainable under the provisions of  26-17-5(a)(4).[13] I would hold that the *423 time within which the suit could be brought was governed by the provisions of  26-17-6(b). I would affirm the judgment of the Court of Civil Appeals on this issue.

III
I now come to the most critical issue presented in this case, and that is the public policy considerations of allowing the biological father to rebut the marital presumption, admittedly one of the strongest known to the law, that a child born during a marriage is the child of the marriage. The Court of Civil Appeals allowed such a rebuttal in this case. Presse v. Koenemann, 554 So.2d 403 (Ala.Civ.App.1988).
Because this case presents a question of the interpretation of Alabama's Uniform Parentage Act under the particular facts of this case, I need not discuss whether a putative biological father would have a substantive "liberty" interest in establishing a relationship with a child born to a mother while she was married to another man in a different factual context. Whether a putative father can prevail depends on the facts of each case.[14]Anonymous v. Anonymous, supra.
In this case, tried and decided under the provisions of the AUPA, there are two conflicting presumptions. Presse is presumed to be the father because he was married to the child's mother at the time the child was both conceived and born.  26-17-5(a)(1). Koenemann is presumed to be the father only because, as Judge Bradley states, "[i]t is undisputed that Koenemann has both received the child into his home and[15] has openly held out that the *424 child is his natural child.  26-17-5(a)(4)." (Emphasis added.)
The trial court and the Court of Civil Appeals correctly held that this case presents the situation where the provisions of  26-17-5(b) apply:
"In the event two or more conflicting presumptions arise, that which is founded upon the weightier considerations of public policy and logic, as evidenced by the facts, shall control. The presumption of paternity is rebutted by a court decree establishing paternity of the child by another man."
The question, then, becomes, which presumption, as evidenced by the facts of this case, "is founded upon the weightier considerations of public policy and logic." The trial court found that the presumption in favor of Koenemann was the weightier.[16] The majority says that it is not logical that two men could be presumed to be the child's father. Of course, it is logical that two men could be presumed to be a child's father, but only one can be the actual father, and the AUPA clearly provides a means to resolve the issue when two or more of these presumptions come into conflict. Section 26-17-5(b) provides, "In the event two or more conflicting presumptions arise, that which is founded upon the weightier considerations of public policy and logic, as evidenced by the facts, shall control." (Emphasis added.) While the majority cites this section, the majority unfortunately ignores what the statute clearly says, and holds that public policy commands that the marital presumption afforded to Presse is the "weightier" one in all circumstances. The majority overlooks the fact that the statute says that the presumption founded upon the weightier considerations of public policy "and logic, as evidenced by the facts "shall control. Without considering "logic" or the facts in this case, the majority "legislates" that the presumption in  26-17-5(a)(1) will always win over the other statutory presumptions without regard to the facts or the realities of modern society.
I have found no Alabama case that sets forth any standard to be applied when a putative father is attempting to rebut the marital presumption. The majority cites Michael H. v. Gerald D., 491 U.S. ___, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989), in support of its decision. The majority completely misreads the holding by the majority in that case. The United States Supreme Court, in Michael H., was presented with what, at first glance, appeared to be a case similar to this case, except that in that case the mother of the child and the man to whom she was married at the time the child was conceived and born did not divorce, and were not divorced when the action was filed, as is the case here, and the child was living in that household, and was not living in the household of the putative father, as is true here, and the putative father in that case had not married the mother of the child, as is also true here. How the majority can conclude that Michael H. supports its holding is not clear. The facts of that case were so different. In that case, under California law, a child born to a married woman living with her husband was presumed to be a child of the marriage under Cal.Evid.Code Ann.  621 (West Supp. 1989). The presumption of legitimacy could be rebutted only by the husband or the wife, and then only in limited circumstances. As pointed out by Justice Scalia, author of the plurality opinion, "[t]he instant appeal present[ed] the claim that the presumption infringes upon the due process rights of a man who wishes to establish his paternity of a child born to the wife of another man, and the claim that it infringes upon the constitutional right of the child to maintain a relationship with her natural father."[17] In that case, the Court held that the  621 presumption did not *425 infringe upon the due process rights of a man wishing to establish his paternity of a child born to the wife of another man, and that the putative father's contention that procedural due process required that he be afforded an opportunity to demonstrate his paternity in an evidentiary hearing fundamentally misconceived the nature of  621. The Court held that, although phrased in terms of a presumption,  621 expressed and implemented a substantive rule of law declaring it to be generally irrelevant for paternity purposes whether a child conceived during, and born into, an existing marriage was begotten by someone other than the husband and had a prior relationship with him, based on the state Legislature's determination as a matter of overriding social policy that the husband should be held responsible for the child and that the integrity and privacy of the family unit should not be impugned. The Court opined that because the putative father's complaint was that the statute categorically denied all men in his circumstances an opportunity to establish their paternity, his challenge was not accurately viewed as procedural. The Court, in a plurality opinion, held that there was no merit to Michael H.'s substantive due process claim that he had a constitutionally protected "liberty" interest in the parental relationship he had established with the child, and that protection of the marital union was a sufficient state interest to support termination of that relationship. The Court also held that the putative father had failed to meet his burden of proving that his claimed "liberty" interest was one so deeply imbedded within society's traditions as to be a fundamental right, the Court concluding not only that he had failed to demonstrate that the interest he sought to vindicate had traditionally been accorded protection by society, but that the common-law presumption of legitimacy and even modern statutory and decisional law demonstrated that society has historically protected, and continues to protect, the marital family against the putative father. In that case, however, the child was still in the marital home.
The Court, in Michael H., discussed the right of a State to foreclose a putative father from establishing his paternal rights, as follows:
"Thus, the legal issue in the present case reduces to whether the relationship between persons in the situation of Michael and Victoria has been treated as a protected family unit under the historic practices of our society, or whether on any other basis it has been accorded special protection. We think it impossible to find that it has. In fact, quite to the contrary, our traditions have protected the marital family (Gerald, Carole, and the child they acknowledge to be theirs) against the sort of claim Michael asserts.
"The presumption of legitimacy was a fundamental principle of the common law. H. Nicholas, Adulturine Bastardy 1 (1836). Traditionally, that presumption could be rebutted only by proof that a husband was incapable of procreation or had had no access to his wife during the relevant period. Id., at 9-10 (citing Bracton, De Legibus et Consuetudinibus Angliae, bk. i, ch. 9, p. 6; bk. ii. ch. 29, p. 63, ch. 32, p. 70 (1569)). As explained by Blackstone, nonaccess could only be proved `if the husband be out of the kingdom of England (or, as the law somewhat loosely phrases it, extra quatuor maria [beyond the four seas]) for above nine months....' 1 Blackstone's Commentaries 456 (Chitty ed. 1826). And, under the common law both in England and here, `neither husband nor wife [could] be a witness to prove access or nonaccess.' J. Schouler, Law of the Domestic Relations  225, p. 306 (3d ed. 1882); R. Graveson & F. Crane, A Century of Family Law; 1857-1957, p. 158 (1957). The primary policy rationale underlying the common law's severe restrictions on rebuttal of the presumption appears to have been an aversion to declaring children illegitimate, see Schouler, supra,  225, at 306-307; M. Grossberg, Governing the Hearth 201 (1985), thereby depriving them of rights of inheritance and succession, 2 Kent's Commentaries 175 (1827), and likely making them wards of the state. A secondary policy concern was the interest in promoting *426 the `peace and tranquillity of States and families.' Schouler, supra,  225, at 304, quoting Boullenois, Traite des Status, bk. 1, p. 62, a goal that is obviously impaired by facilitating suits against husband and wife asserting that their children are illegitimate. Even though, as bastardy laws became less harsh, `[j]udges in both [England and the United States] gradually widened that acceptable range of evidence that could be offered by spouses, and placed restraints on the "four seas rule" ...[,] the law retained a strong bias against ruling the children of married women illegitimate.' Grossberg, supra, at 202.
"We have found nothing in the older sources, nor in the older cases, addressing specifically the power of the natural father to assert parental rights over a child born into a woman's existing marriage with another man. Since it is Michael's burden to establish that such a power (at least where the natural father has established a relationship with the child) is so deeply embedded within our traditions as to be a fundamental right, the lack of evidence alone might defeat his case. But the evidence shows that even in modern timesÔÇöwhen, as we have noted, the rigid protection of the marital family has in other respects been relaxedÔÇöthe ability of a person in Michael's position to claim paternity has not been generally acknowledged. For example, a 1957 annotation on the subject: `Who may dispute presumption of legitimacy of child conceived or born during wedlock,' 53 A.L.R.2d 572, shows three States (including California) with statutes limiting standing to the husband or wife and their descendants, one State (Louisiana) with a statute limiting it to the husband, two States (Florida and Texas) with judicial decisions limiting standing to the husband, and two States (Illinois and New York) with judicial decisions denying standing even to the mother. Not a single decision is set forth specifically according standing to the natural father, and `express indications of the nonexistence of any ... limitation' upon standing were found only `in a few jurisdictions.' Id., at 579.
"Moreover, even if it were clear that one in Michael's position generally possesses, and has generally always possessed, standing to challenge the marital child's legitimacy, that would still not establish Michael's case. As noted earlier, what is at issue here is not entitlement to a state pronouncement that Victoria was begotten by Michael. It is no conceivable denial of constitutional right for a State to decline to declare facts unless some legal consequence hinges upon the requested declaration. What Michael asserts here is a right to have himself declared the natural father and thereby to obtain parental prerogatives. What he must establish, therefore, is not that our society has traditionally allowed a natural father in his circumstances to establish paternity, but that it has traditionally accorded such a father parental rights, or at least has not traditionally denied them. Even if the law in all States had always been that the entire world could challenge the marital presumption and obtain a declaration as to who was the natural father, that would not advance Michael's claim. Thus, it is ultimately irrelevant, even for purposes of determining current social attitudes towards the alleged substantive right Michael asserts, that the present law in a number of States appears to allow the natural fatherÔÇöincluding the natural father who has not established a relationship with the childÔÇöthe theoretical power to rebut the marital presumption, see Note, Rebutting the Marital Presumption: A Developed Relationship Test, 88 Colum.L.Rev. 369, 373 (1988). What counts is whether the States in fact award substantive parental rights to the natural father of a child conceived within and born into an extant marital union that wishes to embrace the child. We are not aware of a single case, old or new, that has done so. This is not the stuff of which fundamental rights qualifying as liberty interests are made.
"In Lehr v. Robertson, a case involving a natural father's attempt to block *427 his child's adoption by the unwed mother's new husband, we observed that `[t]he significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring', 463 U.S., at 262, 103 S.Ct., at 2993, and we assumed that the Constitution might require some protection of that opportunity, id., at 262-265, 103 S.Ct., at 2993-2995. Where, however, the child is born into an extant marital family, the natural father's unique opportunity conflicts with the similarly unique opportunity of the husband of the marriage; and it is not unconstitutional for the State to give categorical preference to the latter. In Lehr we quoted approvingly from Justice Stewart's dissent in Caban v. Mohammed, 441 U.S., at 397, 99 S.Ct. at 1770, to the effect that although `[i]n some circumstances the actual relationship between father and child may suffice to create in the unwed father parental interests comparable to those of the married father,' `the absence of a legal tie with the mother may in such circumstances appropriately place a limit on whatever substantive constitutional claims might otherwise exist.' 463 U.S., at 260, n. 16, 103 S.Ct., at 2993, n. 16. In accord with our traditions, a limit is also imposed by the circumstance that the mother is, at the time of the child's conception and birth, married to and cohabitating with another man, both of whom wish to raise the child as the offspring of their union. It is a question of legislative policy and not constitutional law whether California will allow the presumed parenthood of a couple desiring to retain a child conceived within and born into their marriage to be rebutted.
"We do not accept Justice Brennan's criticism that this result `squashes' the liberty that consists of `the freedom not to conform,' post, at [109 S.Ct.] 2351. It seems to us that reflects the erroneous view that there is only one side to this controversyÔÇöthat one disposition can expand a `liberty' of sorts without contracting an equivalent `liberty' on the other side. Such a happy choice is rarely available. Here, to provide protection to an adulterous natural father is to deny protection to a marital father, and vice versa. If Michael has a `freedom not to conform' (whatever that means), Gerald must equivalently have a `freedom to conform.' One of them will pay a price for asserting that `freedom'ÔÇöMichael by being unable to act as father of the child he has adulterously begotten, or Gerald by being unable to preserve the integrity of the traditional family unit he and Victoria have established. Our disposition does not choose between these two `freedoms,' but leaves that to the people of California. Justice Brennan's approach chooses one of them as the constitutional imperative, on no apparent basis except that the unconventional is to be preferred."
491 U.S. at ___, 109 S.Ct. at 2342-2346.
It must be remembered that Michael H. was a plurality opinion, and there was a vigorous dissent written by Justice Brennan.
One of the most interesting parts of the decision, however, is a special concurring opinion filed by Justice Stevens:
"As I understand this case, it raises two different questions about the validity of California's statutory scheme. First, is Cal.Evid.Code Ann. Section 621 (West Supp.1989) unconstitutional because it prevents Michael and Victoria from obtaining a judicial determination that he is her biological fatherÔÇöeven if no legal rights would be affected by that determination? Second, does the California statute deny appellants a fair opportunity to prove that Victoria's best interest would be served by granting Michael visitation rights?
"On the first issue, I agree with Justice Scalia that the Federal Constitution imposes no obligation upon a State to `declare facts unless some legal consequence hinges upon the requested declaration.' Ante, at [109 S.Ct] 2343. `The actions of judges neither create nor sever genetic bonds.' Lehr v. Robertson, 463 U.S. 248, 261, 103 S.Ct. 2985, 2993, 77 L.Ed.2d 614 (1983).

*428 "On the second issue I do not agree with Justice Scalia's analysis. He seems to reject the possibility that a natural father might ever have a constitutionally protected interest in his relationship with a child whose mother was married to and cohabiting with another man at the time of the child's conception and birth. I think cases like Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) and Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), demonstrate that enduring `family' relationships may develop in unconventional settings. I therefore would not foreclose the possibility that a constitutionally protected relationship between a natural father and his child might exist in a case like this. Indeed, I am willing to assume for the purpose of deciding this case that Michael's relationship with Victoria is strong enough to give him a constitutional right to try to convince a trial judge that Victoria's best interest would be served by granting him visitation rights. I am satisfied, however, that the California statute, as applied in this case, gave him that opportunity."
491 U.S. at ___, 109 S.Ct. at 2347.
As I read the plurality opinion of the Court in Michael H., it states that the putative father there did not show that the California scheme was unconstitutional, and Justice Stevens, in his special concurrence, specifically stated that he did not agree with Justice Scalia, who "seems to reject the possibility that a natural father might ever have a constitutionally protected interest in his relationship with a child whose mother was married to and cohabiting with another man at the time of the child's conception and birth." Michael H. should be read as allowing states a measure of control in situations where the marital presumption is present, and the putative father is an outsider seeking to destroy the integrity of the family, but Justice Stevens categorically says that Michael H. did not foreclose the showing of a "liberty" interest by a putative father if the marital family is not intact, as is true here. I do not believe Michael H. controls, under the facts of this case.
I can agree with the majority that the marital presumption is a time-honored one and that it should be a stronger presumption than the other presumptions in the statute. However, the strength of the marital presumption cannot be considered in a vacuum so that it will outweigh other valid statutory presumptions every time. As the statute commands, logic and the facts must be considered in deciding whether the marital presumption will control in a case. The marital presumption had a sound basis in the past when there was no way to test paternity, but modern science and technology have progressed a great deal in the area of determining paternity. The majority apparently refuses to recognize this fact, even though the Supreme Court of the United States has recognized that the marital presumption is not conclusive.[18]
In this case, it has been scientifically shown that Presse cannot be Shelly's father, but since that fact conflicts with the "ancient" marital presumption, the majority says that it has no weight. This Court has stated countless times that the best interest of the child is the overriding concern in family law cases. Here, the majority states that there is a substantial state interest in "the psychological stability and general welfare of the child." How psychologically stabilizing is it going to be for Shelly to live with Koenemann and know that Koenemann is her father yet have the Supreme Court of Alabama command that Presse be her father, despite the impossibility of that relationship?
I would hold that Alabama's Uniform Parentage Act granted Koenemann standing to have his parentage established, and that the Alabama statute and the trial judge's determination in this case are not violative of any right Presse might have to *429 protect "family integrity."[19] His family was destroyed by the divorce, which may have been caused by his wife's infidelity that resulted in Shelly's birth.
Although I have not found an Alabama case that discusses the effect of the provisions of the Uniform Parentage Act when there are conflicting presumptions, I have found a case from another jurisdiction that does discuss the question, although the Court determined in that case that the Uniform Parentage provision did not apply. In Matter of Estate of Calloway, 206 N.J.Super. 377, 502 A.2d 1169 (1986), a mother, on behalf of her minor child, who she claimed was the daughter of the deceased, sought to claim the deceased's entire estate. The trial court had set aside her letters of administration and had granted letters to the decedent's father, apparently on the ground that the minor child was conceived and born while the mother was married to another man. The Court set out the evidence in the case, as follows:
"Wilhelmena Brown married Leroy Washington on June 12, 1954, in Florida and they had at least six children. In 1964 they separated and Ms. Brown moved to New Jersey. She obtained a `no fault' divorce (18 months separation) from Leroy Washington in New Jersey on April 23, 1975, pursuant to N.J.S.A. 2A:34-2d., and Tamika was born less than two months later. Based upon her weight at birth, it was clear that Tamika was a full-term babyÔÇöand there was a conflict of testimony as to whether Ms. Brown first met the decedent in the summer of 1974 (and had sexual intercourse with him in September when she said she conceived), or around Thanksgiving as William Calloway's witnesses asserted. It is not clear if the trial judge resolved this conflict against Ms. Brown, but his analysis of the proofs was as follows:
"`The testimony of [Ms. Brown] was to the effect that at the time of the conception of [Tamika], her husband and she were separated and had been for many years. She claims that she was dating the decedent and that the child was conceived by him. She produced a photograph and greeting card album to demonstrate that the decedent called himself `daddy' and that he openly acknowledged the child as his own. She stated that the decedent sent her money regularly for the support of the child. She produced the employer of the decedent who testified that she had seen the plaintiff, the child and the decedent together and that the decedent told her that the child was his and that he loved her very much. The other proofs were from the neighbors and witnesses who testified that the decedent would come to [Ms. Brown's] house every week, shopped together and helped with the child's homework and wathced [sic] *430 T.V. together. No other proofs were adduced that are noteworthy here.
"`The defense rests essentially on the presumption that [Ms. Brown] failed to overcome the presumption against the legitimacy of the child through the marriage of Wilhelmena Brown and Leroy Washington.
"`The contestants, namely the relatives of the decedent, presented testimony that would tend to show that the child was conceived at a time prior to that time claimed by [Ms. Brown]. They further produced copies of application by "Willie Mae Washington" for welfare which contradict certain testimony of [Ms. Brown].'
"At the time of trial, Tamika was eight years old. She identified a picture of the decedent and told the judge he visited her a lot and that she called him `Daddy.' William Calloway confirmed this, as well as the fact that the decedent sent Ms. Brown support payments for Tamika. Tamika was also mentioned in a January 19, 1980 Abyssinian Baptist Church obituary as a surviving granddaughter of William Calloway's late wife, Nellie. Decedent's brother, Aaron Calloway admitted that Castelow told him Tamika was his childÔÇöand Aaron signed a statement for social security purposes verifying the father-daughter relationship. In short, although the trial judge did not specifically so find, the record is clear that the decedent provided support for Tamika and there was a mutually acknowledged father and child relationship."
206 N.J.Super. at 379-80, 502 A.2d at 1170.
The Court then held:
"The harsh common law doctrine that an illegitimate child was nullius filius, and inherited from neither mother nor putative father, has been abrogated in New Jersey. 7A N.J. Practice (Clapp and Black, Wills and Administration),  1573 (Rev.3rd Ed.1984); In re Maislin's Estate, 181 N.J.Super. 14, 17-18, 436 A.2d 539 (App.Div.1981). The New Jersey Parentage Act, N.J.S.A. 9:17-38 et seq. established the principle that the parent and child relationship extends equally to every child and to every parent, regardless of the marital status of the parents. The Parentage Act provides at N.J.S.A. 9:17-43a., that `[a] man is presumed to be the natural father of a child if: ... (5) while the child is under the age of majority, he provides support for the child and openly holds out the child as his natural child; ...' The Parentage Act also recognizes the problem of conflicting presumptions and provides at N.J.S.A. 9:17-43b., c. and d.:
"`b. A presumption under this section may be rebutted in an appropriate action only by clear and convincing evidence. If two or more presumptions arise which conflict with each other, the presumption which on the facts is founded on the weightier considerations of policy and logic controls. The presumption is rebutted by a court order terminating the presumed father's paternal rights or by establishing that another man is the child's natural or adoptive father.'
"* * * *
"From the foregoing, it appears that any presumption that Tamika is the natural daughter of Leroy Washington (common law presumption of legitimacy, or effective `presumption' because of clear and convincing proof required to establish putative paternity under N.J.S.A. 3B5-10, or its predecessor N.J.S.A. 3A:2A-41b.(2)), would be offset by the cited provisions of N.J.S.A. 9:17-43, and the ultimate judicial finding of fact would only be required to be supported by a preponderance of the evidence. We realize, of course, that the Parentage Act was not effective until May 20, 1983. We believe, however, that the rationale is equally applicable to the pre-Parentage Act situation under review. In other words, Castelow Calloway's support of Tamika and his holding her out to his father and brother as his daughterÔÇöcoupled with the mutally acknowledged parent-child relationshipÔÇöare sufficient not only to rebut any presumption that Tamika was the daughter of Leroy Washington, but to establish that for purposes of *431 intestate succession she was the daughter of decedent."
206 N.J.Super. at 380-82, 502 A.2d at 1170-71. I think that the primary factor to be considered when there are conflicting presumptions, especially in a marital presumption case like this one, is to apply what is described in the Columbia Law Review article[20] as a "developed relationship" test. See, 88 Col.L.Rev., at 383. According to that article, the "developed relationship" test "has been gauged by many factors, including emotional attachments, daily association, financial support and the formal ties of marital and blood relationships."
In this case, the trial judge's order can be sustained by application of the "developed relationship" test. Koenemann has rebutted by clear and convincing evidence the marital presumption, and even though the child was in a family relationship with Presse before he and the child's mother were divorced, custody of the child was given to the mother shortly after the divorce, upon her marriage to the putative father. With the exception of the relationship that Presse might have established in his visitations, and the support he provided pursuant to the terms of the divorce decree, the "weightier" evidence obviously favors Koenemann, and the trial court so found. Admittedly, Koenemann did not file the action as soon as he could have, but I find that he established that he was a presumed father under the provisions of  26-17-5(a)(4); therefore, he filed it within the time allowed by law.  26-17-6(b). Furthermore, there is no showing in this case that the delay worked adversely to the interest of either Presse or the child, because the child had developed a relationship with her natural father.
Unlike the majority, I believe that the decision of the trial court protects the integrity of the family unit, which is the interest the Constitution protects, and that the trial court's ruling does not infringe unconstitutionally upon Presse's rights. The test I would adopt, if properly applied, would protect the integrity of the family unit and the interests of the child, plus the interest of a biological father who is a "presumed father." The test would protect families because it would require a finding of the existence of a "family unit." It would serve the interest of the State of Alabama in protecting families and children by permitting the marital presumption to be challenged only by someone who, like Koenemann, has received the child into his home and openly held her out as his child, while at the same time preventing outsiders, even biological fathers, from interfering with the integrity of family relationships, which was the situation in Michael H.
The majority's decision, by denying Koenemann standing under the facts of this case, has denied him due process of law. Although this decision does not involve a fact situation in which a father is being involuntarily forced to support a child, the majority opinion has held, at least inferentially, that a man, even if he could conclusively show that he was not the father of a child, could, under the provisions of the Alabama Uniform Parentage Act, nevertheless be forced to support the child merely because he was married to the mother at the time the child was conceived and born.
As a parting comment, let me say that the AUPA was adopted primarily to provide a procedure for identifying putative fathers so that they could be made legally responsible for the support of the children they had sired. In this case, neither the biological father nor the presumed father wants to renounce any legal obligations connected with the child. Assume, however, the same basic facts of this case, and assume that Shelly was in need of "necessaries," and Presse, because he was not the biological father, did not want to support Shelly. Assume also, that even though Shelly had lived with Koenemann and she called him "daddy," he refused to support her because she was a "stepchild" as the majority holds. If the parties authorized to bring an action under the AUPA brought an action against Presse or Koenemann under these facts, which man would be legally required to support her? Koenemann, *432 of course. Then, why is the law different just because the presumed father does not desire to rebut the presumption?
The decisions of the Supreme Court of the United States that I have read do not support the majority's opinion.
I must respectfully dissent.
NOTES
[1] For the sake of clarity, we note that not all of the above-quoted statutory provisions are directly applicable to this case; rather, we have quoted extensively from the statutory language to convey an overview of the Act.
[2] We note that the essential difference between the majority opinion and Chief Justice Torbert's dissent in Ex parte Anonymous, supra, lies primarily in the fact that the UPA was not in effect when the action in that case was commenced, the Chief Justice taking the position that, as to the standing issue, the adoption of the UPA was a mere codification of existing law.
[3] The child's mother did challenge the presumption, but her challenge was not recognized because of the principle of res judicata. Majority opinion, supra, 554 So.2d at 411.
[4] To reach the conclusion that Presse must be Shelly's father, even though he is not, the majority decides that the clear and plain language of the AUPA is not what the Legislature intended to say at all. While I recognize that the main reason behind the AUPA is to allow a mother or the State to force a presumed father to pay child support and that it was not meant to be the means by which two men who both want to be the recognized father of a child could settle the matter, it remains the vehicle by which paternity is established in this state.
[5] The majority states:

"It is also interesting to note that a Columbia Law Review article, which discussed both the favorable and the unfavorable aspects of `inclusive statutes' (those which grant a man claiming to be the biological father the right to challenge a presumed father's presumption of paternity) and `exclusive statutes' (those which preclude such a man from contesting a presumed father's presumption of paternity), placed Alabama, based on  26-17-6(c), in the `exclusive statute' class. Note, Rebutting the Marital Presumption: A Developed Relationship Test, 88 Colum.L.Rev. 369 (1988)."
What the majority overlooks is that the author of the very article it cites states:
"Inclusive statutes, which grant all putative fathers a right of action, are unconstitutional because they infringe the due process rights of the marital family without sufficient justification. Exclusive statutes, which deny all putative fathers a right of action, violate the due process and equal protection clauses of the fourteenth amendment because they deny a putative father the fundamental right to maintain a relationship with his child. A balancing of the interest of all the parties is necessary. Not all putative fathers and not all families are similarly situated; thus their constitutional interest cannot be protected by a blanket statute that treats all putative fathers alike."
88 Colum.L.Rev. at 375.
[6] A reading of the Michael H. case, which the majority correctly points out was a plurality opinion, unequivocally shows that at most only four Justices concurred in Justice Scalia's opinion, and that Justice Stevens, as I shall show infra, concurred only because of the particular facts that were present in that case. It is my opinion that a majority of the Supreme Court of the United States, faced with the facts of this case, would hold that this Court's holding, which denies the natural father standing, and which deprives him of the father-child relationship he has established, is unconstitutional.
[7] It will be noted that two of the Judges on the Court of Civil Appeals were of the opinion that Koenemann had standing, and Judge Holmes thought Koenemann lacked standing only because he waited too late to file his claim.
[8] In considering the application of 26-17-1 et seq. to the facts presented, it should be remembered that the ultimate objective of the Uniform Parentage Act is to promote full equality for all children, be they legitimate or illegitimate, to paternal support. Here, the putative father is obviously willing to support the child.

"By emphasizing the equality of all children and by according illegitimate children an extensive right to paternal support, the UPA ensures that illegitimate children will no longer be subject to the social and legal discrimination they traditionally have suffered.... Under the UPA, the interests of the illegitimate child are deemed to be paramount to those of the other parties to the proceeding. The interest of the other parties are not completely discounted, but merely subordinated to those of the child."
Comment, Statutes of Limitations in Paternity Proceedings: Barring an Illegitimate's Right to Support, 32 Am.U.L.Rev. 567, 612 (1983).
[9] Section 26-17-7 provides:

"Actions commenced under this chapter shall be in the name of the state of Alabama on relation of the complaining witness or party against the person claimed to be the father or against the person alleged to owe a duty of support as the defendant. The district attorney, special prosecutor or attorney otherwise authorized to represent the state of Alabama shall appear and prosecute all proceedings brought under this chapter. (Acts 1984, No. 84-244, p. 375,  7.)"
The Court of Civil Appeals and the trial court treated the action as one filed pursuant to the provisions of the Alabama Uniform Parentage Act. I so treat it, but by doing so, I should not be understood as believing that Koenemann, in the absence of a statutory grant of a right to sue, might not have a right of action under the federal Constitution to establish that he had a constitutionally protected relationship between him and the child. See Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) and Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979); see, also, opinion of Justice Stevens, concurring in the judgment, Michael H. v. Gerald D., 491 U.S. ___, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989); see, also, R. McG. v. J.W., 200 Colo. 345, 352-53, 615 P.2d 666, 672 (1980) (UPA provision barring suit by extramarital biological father was held to be unconstitutional). In other words, Koenemann's right of action could be grounded in a "liberty" interest and is not dependent on the statute. Anonymous v. Anonymous, 472 So.2d 640 (Ala.Civ. App.1984), writ quashed, 472 So.2d 643 (Ala. 1985).
[10] I note that Koenemann concedes that his wife, Jean Ann, who was married to Presse at the time the child was born, is barred by the doctrine of res judicata from bringing a paternity action because she was a party to the original divorce action, in which it was stated that the child was born of the marriage, and a judgment was rendered in that action which affected the child. See Collier v. State ex rel. Kirk, 454 So.2d 1020 (Ala.Civ.App.1984).
[11] The majority's reliance on the dissent in Anonymous is unfortunate because the dissent is contrary to the law developed by the United States Supreme Court on the standing question.
[12] Holmes, J., in his dissent, notes that "the trial court apparently concluded that Koenemann was a `presumed father' under  26-17-5(a)(4), and, therefore, could bring an action pursuant to  26-17-6(b)."
[13] Because Koenemann fits classification (4), I need not discuss whether he may technically also fit classification (3). I do note that the statute contemplates different presumptions and that if there is a conflict, the weightier one controls. Also, I do not discuss whether Koenemann's liberty interest guaranteed by the Constitution of the United States could be absolutely foreclosed by a shortened statute of limitations.
[14] In this case, the trial court and the Court of Civil Appeals found that Koenemann has shown that he is a "presumed father" under the provisions of the Alabama Uniform Parentage Act. Consequently, to decide the issue presented in this case, we need not discuss whether a putative father, who was unable to come within one of the statutory "presumptions," could maintain an action. Cf. Anonymous v. Anonymous, supra, which authorizes an action, but recognizes that a putative father might not prevail. Alabama's current statute makes no provision for granting a right of action to a putative father, who, like Koenemann, could prove through blood tests, as Koenemann did here, that "[he] and the child share genetic markers and that there is a 99.36 percent probability that [he] is the biological father." In a law review article, Note, Rebutting The Marital Presumption: A Developed Relationship Test, 88 Colum.L.Rev. 369 (1988), the constitutionality of both "inclusive" statutes (those which would always allow the putative biological father a right of action) and "exclusive" statutes (those which would prohibit putative biological fathers from rebutting the marital presumption) are discussed, as follows:

"Inclusive statutes, which grant all putative fathers a right of action, are unconstitutional because they infringe the due process rights of the marital family without sufficient justification. Exclusive statutes, which deny all putative fathers a right of action, violate the due process and equal protection clauses of the fourteenth amendment because they deny a putative father the fundamental right to maintain a relationship with his child. A balancing of the interests of all the parties is necessary. Not all putative fathers and not all families are similarly situated; thus their constitutional interests cannot be protected by a blanket statute that treats all putative fathers alike."
Id., at 375.
The author of the Columbia Law Review article concluded that a "developed relationship" test should be adopted which would apply to cases where a putative father desires to rebut the marital presumption:
"The defects of current statutory approaches illustrate the need for a standard that accurately determines which putative fathers should be given a right of action to rebut the marital presumption and which should not. The standard should be based upon whether the putative father has a developed relationship with his child. All putative fathers should be afforded a preliminary hearing to determine whether such a relationship exists. To determine whether such a relationship exists, a court must examine both objective and subjective factors. If the relationship exists, it deserves constitutional protection. This standard treats putative fathers as individuals and affords their interests constitutional protection, but protects the marital family from unnecessary intrusions."
Id., at 383.
[15] Judge Bradley uses the word "and," which is the word used in the Uniform Parentage Act. Alabama's Act uses the word "or," not "and." I need not discuss when, or under what circumstances, a person could be presumed to be the father of a child by a showing only that "while the child is under the age of majority, he receives the child into his home," without a showing that he also openly held the child out as his natural child. Because proof of both was made here, I need not discuss this question. I would note it for possible clarification by the Legislature.
[16] Judge Holmes, in his dissent, thought that Koenemann's delay should have tipped the scales in favor of Presse.
[17] I do not set out fully the facts in the case, but instead refer the reader to the extensive statement of facts contained in the opinion of the Supreme Court of the United States.
[18] The United States Supreme Court has recognized that scientific advances in blood testing have greatly alleviated the problems of proof surrounding paternity actions. Pickett v. Brown, 462 U.S. 1, 17, 103 S.Ct. 2199, 2208, 76 L.Ed.2d 372 (1983).
[19] Cf. Lehr v. Robertson, 463 U.S. 248, 261, 103 S.Ct. 2985, 2993, 77 L.Ed.2d 614 (1983) (putative father found not to have a developed relationship with his child, and, therefore, no constitutionally protected right to family integrity). I recognize there is evidence in this case that Presse had developed a relationship with the child immediately after its birth and through visitations. The trial judge and the Court of Civil Appeals both applied the principle of law that the marital presumption was one of the strongest known to law, but determined, based on the evidence, that Koenemann had rebutted it by showing that he, too, was a presumed father, and determined that the weightier considerations of public policy favored a determination that Koenemann was the father. It should be noted, however, that the trial court awarded Presse certain visitation rights, which would allow him to continue the relationship that he says was established. The holding of the majority could mean that this child cannot now inherit from Koenemann unless he makes provision for her in his will. Shelly was not a party in this case, and she was not represented by a guardian ad litem at trial. She may have the right to petition a court to have the issue of who is her father litigated once again, and this decision today might not be res judicata as to her. However, it is clear from the majority's opinion that they would rule again that Presse and not Koenemann is her father; after all, unless Presse renounces his paternal status, the marital presumption, according to the majority, is irrebuttable and this Court might again tell Shelly that it is in her best interest that Presse be declared to be her father, although he is not. I cannot see how that is in her best interest. Of course, the ultimate decision of which man Shelly will treat as her "father" could be Shelly's alone, and another court might see that today's decision was incorrectly decided.
[20] The majority cites this article, but ignores its substantive suggestions.