[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 07 2000
THOMAS K. KAHN
CLERK

_____

No. 98-5292

_____

D. C. Docket No. 96-02614-CV-KMM

BRUCE G. MURPHY,

Plaintiff-Appellant,

versus

FEDERAL DEPOSIT INSURANCE
CORPORATION, as receiver for Southeast Bank, N.A.;
JEFFREY H. BECK,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(April 7, 2000)**

Before BIRCH and MARCUS, Circuit Judges, and ALAIMO[*], Senior District Judge.

MARCUS, Circuit Judge:

---

[*] Honorable Anthony A. Alaimo, Senior U.S. District Judge for the Southern District of Georgia, sitting by designation.

Plaintiff-Appellant Bruce G. Murphy ("Murphy") appeals the district court's order dismissing his amended complaint against Defendant Jeffrey Beck, as Successor Agent for the Federal Deposit Insurance Company, ("FDIC"). Among other things, the district court held that Murphy's claims against the FDIC were barred by the federal common law D'Oench, Duhme doctrine first expounded by the Supreme Court in D'Oench, Duhme & Co., Inc. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). Because acceptance of the D'Oench, Duhme doctrine is well-settled in this Circuit, and because we can discern no sound reason for not applying the doctrine in this case, we affirm the district court's order dismissing Murphy's complaint.

## I.

The facts underlying this case are straightforward, but the procedural history of the case is both unusual and important. In June 1989, Murphy received a letter from Robert H. Haines, III, a general partner in Orchid Island Associates Limited Partnership ("Orchid"), soliciting Murphy's investment in Orchid's development of the Orchid Island Golf and Beach Club Project (the "Project") located in Indian County, Florida. The letter projected a 6.1 multiple return on investments. Soon thereafter, on August 18, 1989, Murphy invested $515,672.37 in a limited partnership interest in Orchid.

2

Southeast Bank provided several loans for the Project from the fall of 1988 until the beginning of 1991. These loans totaled approximately $50 million. Orchid eventually defaulted on its loans and Southeast foreclosed on the property. Southeast itself was declared insolvent on September 19, 1991 and placed in FDIC receivership.

On August 20, 1992, Murphy filed suit in the United States District Court for the District of Columbia against the FDIC, as receiver for Southeast, alleging that Southeast asserted extensive control over the Project and that Southeast knew about and participated in the fraudulent activities of Orchid's principals. According to the complaint, Murphy was induced to invest by a solicitation letter from Orchid which falsely represented that projections by Arthur Anderson & Co. reflected a "6.1 multiple return on [] [his] investment." Murphy claimed that Southeast acted in concert with Orchid in making decisions pertaining to the Orchid development, and that these decisions were separate and apart from Southeast's role as a mere lender to Orchid. Murphy added that Southeast's actions as a joint venturer with Orchid in the Project caused the loss of his financial investment. Accordingly, Murphy sued for breach of fiduciary duty, breach of contract, accounting deficiencies, fraud, negligent misrepresentation and securities violations.

The FDIC moved to dismiss the complaint on the grounds that Murphy's claims were barred by the federal common law doctrine of D'Oench, Duhme. On August 10, 1993, the district court, treating the FDIC's motion as a motion for summary judgment, granted summary judgment on all counts. The district court ruled that under the D'Oench, Duhme doctrine, Murphy could not assert a claim against the FDIC based on the theory that Southeast was a joint venturer with Orchid in the Project because there was no written joint venture agreement between the two. Murphy v. FDIC, 829 F. Supp. 3, 5-6 (D.D.C. 1993). In fact, the written agreements between the bank and Orchid denied such a relationship. Id. On appeal, the Court of Appeals for the D.C. Circuit reversed the district court's decision on all but two counts,[1] holding that the D'Oench, Duhme doctrine had been preempted by the Financial Institutions Reform, Recovery, and Enhancement Act of 1989 (FIRREA) and did not, therefore, bar Murphy's claims. See Murphy v. FDIC, 61 F.3d 34, 39 (D.C. Cir. 1995) (concluding that "the inclusion of §

---

[1] The Circuit Court affirmed the district court's grant of summary judgment in favor of the FDIC on Murphy's two procedural claims seeking 1) a declaratory judgment that the FDIC is required by statute to establish an ADR procedure, and 2) a writ of mandamus compelling that result. As for the first claim, the court held that although the Financial Institutions Reform, Recovery, and Enhancement Act of 1989 (FIRREA) did not seem to require the FDIC to establish an ADR process, the FDIC appeared to have initiated such a program and therefore Murphy's request for the court to order the FDIC to do so was moot. As for the second claim, the court held that the FIRREA gave the FDIC discretion to decide whether to refer any particular case to ADR and therefore Murphy was not entitled to an order compelling the FDIC to direct his case to ADR. Murphy, 61 F.3d at 40-41.

1821(d)(9) in the FIRREA implies the exclusion of overlapping federal common law defenses not specifically mentioned in the statute--of which the D'Oench doctrine is one").

After remand to the district court, the FDIC again moved to dismiss the complaint for failure to state a claim. Without ruling on the motion, the district court transferred the case to the Southern District of Florida, concluding that the Southern District of Florida was a more convenient location for the case because the Plaintiff and the majority of witnesses resided in the district and both the Project and Southeast Bank had been located there. The district court for the Southern District of Florida substituted Jeffrey H. Beck as successor agent for the FDIC and, thereafter, granted the FDIC's Motion to Dismiss. The district court offered three alternative grounds for its decision: first, loan agreements between Orchid and Southeast disclaiming the existence of a joint venture barred Murphy, as a limited partner in Orchid and therefore a party to the agreements, from asserting such a joint venture; second, even if Murphy were not a party to the agreements, he failed to prove the existence of a joint venture relationship between Orchid and Southeast; and finally, the federal common law D'Oench, Duhme doctrine barred Murphy's claim.

II.

We review a district court's order granting a motion to dismiss for failure to state a claim de novo. Beck v. Deloitte & Touche, 144 F.3d 732, 736 (11th Cir. 1998); McKusick v. City of Melbourne, 96 F.3d 478, 482 (11th Cir. 1996). When considering a motion to dismiss for failure to state a claim, a court must accept the allegations in the complaint as true, construing them in the light most favorable to the plaintiff. Kirby v. Siegelman, 195 F.3d 1285, 1289 (11th Cir. 1999).

On appeal, we need only consider the district court's third reason for dismissal. Plainly, the D'Oench, Duhme doctrine was intended "to protect [the FDIC] and the public funds which it administers against misrepresentations as to the securities or other assets [and liabilities] in the portfolios of the banks which [the FDIC] insures." D'Oench, Duhme, 315 U.S. at 457, 62 S.Ct. at 679, 86 L.Ed. 956. The doctrine originated more than half-a-century ago in the case of D'Oench, Duhme & Co., Inc. v. FDIC where a securities dealer who executed a demand note with a bank tried to prevent the FDIC, which had acquired the note, from enforcing it because of the dealer's separate agreement with the bank that the note would not be called for payment. The Supreme Court rejected the defense and

6

squarely held that a secret agreement not on the bank's records could not operate as

a defense against the FDIC's suit.  Id. at 459, 62 S.Ct. at 680.[2]


The Eleventh Circuit has described the scope of the D'Oench, Duhme

doctrine in these terms:

> In a suit over the enforcement of an agreement originally executed
> between an insured depository institution and a private party, a private
> party may not enforce against a federal deposit insurer any obligation
> not specifically memorialized in a written document such that the
> agency would be aware of the obligation when conducting an
> examination of the institution's records.

Baumann v. Savers Federal Sav. and Loan Ass'n, 934 F2d 1506, 1515 (11th Cir.

1991).  See also  Motorcity of Jacksonville, Ltd. v. Southeast Bank N.A.,

---

[2]    Eight years later, Congress partially codified the holding of D'Oench, Duhme, as
section 2(13)(e) of the Federal Deposit Insurance Act of 1950, 12 U.S.C. § 1823(e)(1).  This
provision, as modified by the Financial Institutions Reform, Recovery, and Enforcement Act,
Pub. L. No. 101-73, currently provides:

> No agreement which tends to diminish or defeat the interest of the Corporation
> [FDIC] in any asset acquired by it under this section or section 1821 of this title,
> either as security for a loan or by purchase or as receiver of any insured
> depository institution, shall be valid against the Corporation unless such
> agreement--
> (A) is in writing,
> (B) was executed by the depository institution and any person claiming an
> adverse interest thereunder, including the obligor, contemporaneously with the
> acquisition of the asset by the depository institution,
> (C) was approved by the board of directors of the depository institution or its loan
> committee, which approval shall be reflected in the minutes of said board or
> committee, and
> (D) has been, continuously, from the time of its execution, an official record of
> the depository institution.

("Motorcity I"), 83 F.3d 1317, 1326 (11th Cir. 1996) (en banc), vacated and remanded by Hess v. FDIC, 519 U.S. 1087, 117 S.Ct. 760, 136 L.Ed.2d 708 (1997), reinstated by Motorcity of Jacksonville, Ltd. v. Southeast Bank N.A., ("Motorcity II") (en banc), 120 F.3d 1140 (11th Cir. 1997), cert. denied, Hess v. FDIC, 523 U.S. 1093, 118 S.Ct. 1559, 140 L.Ed.2d 791 (1998).[3] We have held that the doctrine "'applies in virtually all cases where a federal depository institution regulatory agency is confronted with an agreement not documented in the institution's records.'" OPS Shopping Ctr., Inc. v. FDIC, 992 F.2d 306, 308 (11th Cir. 1993) (quoting Baumann, 934 F.2d at 1510). We have also made clear that the doctrine applies when the FDIC is acting as a receiver. See FSLIC v. Two Rivers Assocs., Inc., 880 F.2d 1267, 1274, 1276-77 (11th Cir. 1989) (holding that the federal common law D'Oench, Duhme doctrine protects the FSLIC and the FDIC in both receiver and corporate capacities); Timberland Design, Inc. v. First Serv. Bank for Sav., 932 F.2d 46, 49 (1st Cir. 1991) (per curiam) (citing cases for the proposition that "courts have consistently applied the [D'Oench, Duhme] doctrine to those situations where the FDIC was acting in its capacity as receiver").

---

[3] The Supreme Court granted certiorari on Motorcity I, vacated our judgment, and remanded the case for further consideration in light of its decision in Atherton v. FDIC, 519 U.S. 213, 117 S.Ct. 666 (1997). In Motorcity II, after considering the Supreme Court's decision in Atherton, we reaffirmed our previous holding in Motorcity I and reinstated that opinion.

8

Because no written agreement exists between Southeast and Orchid, if the D'Oench, Duhme doctrine applies in this case, it bars Murphy's claims against the FDIC which are based on his allegations that Orchid and Southeast were acting as joint venturers. Murphy argues, however, that there are four independent reasons why the D'Oench, Duhme doctrine should not be applied in this case: first, the choice of law doctrine requires application of D.C. Circuit law rather than Eleventh Circuit law; second, the D.C. Circuit's decision that the D'Oench, Duhme doctrine has been preempted by the FIRREA should be accepted as law of the case; third, the doctrine should not be applied to cases in which the receivership has generated a surplus; and finally, the doctrine is no longer valid in light of recent Supreme Court rulings. We are not persuaded by any of these arguments and address each in turn.

A.

We have had occasion recently to disagree with the D.C. Circuit as to the continued viability of the D'Oench, Duhme doctrine. In its consideration of this case before transfer, the D.C. Circuit held that the doctrine had been preempted by the FIRREA, and therefore could not bar Murphy's claims. Murphy v. FDIC, 61 F.3d at 38. According to the D.C. Circuit, "the Supreme Court . . . necessarily decided the D'Oench question. . . . [T]he inclusion of § 1821(d)(9) in the FIRREA

9

implies the exclusion of overlapping federal common law defenses not specifically mentioned in the statute--of which the D'Oench doctrine is one." Id. at 39. In both Motorcity I and Motorcity II, we expressly disagreed with the D.C. Circuit's rejection of the doctrine. See Motorcity I, 83 F.3d at 1327 (noting that "[i]n Murphy v. FDIC, 61 F.3d 34 (D.C.Cir. 1995), the D.C. Circuit recently held that the Supreme Court's reasoning in O'Melveny & Myers v. FDIC, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), leads 'ineluctably' to the conclusion that the common law D'Oench doctrine has been preempted. Id. at 38. . . . We disagree . . . and hold that the federal common law D'Oench doctrine has not been preempted by statute" (internal citations omitted)); Motorcity II, 120 F.3d at 1141-44 (noting the circuit split between the D.C. and Eighth Circuits, which have held that the FIRREA displaced the D'Oench, Duhme doctrine, and the Fourth Circuit, which has held that it did not, and holding that the federal common law doctrine was not preempted by the FIRREA and remained good law in this Circuit). In Motorcity II we concluded that "the analysis set forth in our prior en banc opinion [Motorcity I] reflects the most reasonable reading of Congress's intent--i.e., that Congress did not intend FIRREA to displace the D'Oench doctrine, but rather intended to continue the harmonious, forty-year coexistence of the statute and the D'Oench doctrine." Id. at 1144.

10

Murphy argues nevertheless that we should apply the law of the D.C. Circuit rather than our own law to his claims because the law of the transferor court should govern in the context of transfers pursuant to 28 U.S.C. § 1404(a). Although this circuit has not addressed the question of whether a transferee court should follow its own interpretation of federal law or that of the transferor court, several other circuits have addressed the question, and all have concluded that the transferee court should apply its own interpretation of federal law. We find the reasoning of these circuits persuasive.

In In re Korean Air Lines Disaster of September 1, 1983, 829 F.2d 1171 (D.C. Cir. 1987), the D.C. Circuit addressed the question of what law to apply to a number of wrongful death actions that were transferred to the District of Columbia pursuant to 28 U.S.C. § 1407 for consolidated pretrial proceedings. The substantive issue before the court was whether the per-passenger damage limits set by the Warsaw Convention should be applied to limit Korean Air Lines' liability when the type size of the liability limit printed on the tickets was smaller than the size required by the Montreal Agreement. The district court, interpreting District of Columbia law, held that the damage limits were applicable. See In re Korean Air Lines Disaster of September 1, 1983, 664 F. Supp. 1463 (D.D.C. 1985). This ruling was, however, contrary to precedent in the Second Circuit where several of

11

the cases had originally been filed.  See In re Korean Air Lines Disaster, 829 F.2d

at 1172.  The D.C. Circuit affirmed the district court's order squarely holding "that

the district court properly adhered to its own interpretation of the Warsaw

Convention/Montreal Agreement in all actions, including those transferred from

district courts within the Second Circuit."  Id. at 1173.

The court also distinguished In re Korean Air Lines from Van Dusen v.

Barrack, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964), in which the Supreme

Court held that when a defendant in a diversity action moves for a transfer of

venue under 28 U.S.C. 1404(a), the state law that would have applied in the

transferor court adheres to the case.  See Van Dusen, 376 U.S. at 637-39, 84 S.Ct.

at 820.  The D.C. Circuit explained that the logic behind Van Dusen--reflecting the

need to ensure that federal and state courts uniformly apply the same state law to

diversity cases regardless of where the cases are tried--does not apply to a case

brought under federal law because federal law is supposed to be unitary.  In re

Korean Air Lines, 829 F.2d at 1175-76.   As the Circuit Court explained:

> Our system contemplates differences between different states' laws;
> thus a multidistrict judge asked to apply divergent state positions on a
> point of law would face a coherent, if sometimes difficult, task.  But it
> is logically inconsistent to require one judge to apply simultaneously
> different and conflicting interpretations of what is supposed to be a
> unitary federal law.

12

Id. at 1175-76.  The court concluded that "[t]he federal courts . . . owe respect to each other's efforts and should strive to avoid conflicts, but each has an obligation to engage independently in reasoned analysis.  Binding precedent for all is set only by the Supreme Court, and for the district courts within a circuit, only by the court of appeals for that circuit."  Id. at 1176.

The Second, Eighth, and Ninth Circuits uniformly have agreed with the D.C. Circuit that in cases where federal law is at issue, transferee courts are obligated to follow their own interpretation of the relevant law.  See Campos v. Ticketmaster Corp., 140 F.3d 1166, 1171 n. 4 (8th Cir. 1998) (holding that the consolidated issues the court was hearing were controlled by the law of its circuit and not the law of the various circuits from which the cases were transferred); Temporomandibular Joint (TMJ) Implant Recipients v. E.I. DuPont De Nemours & Co., 97 F.3d 1050, 1055 (8th Cir. 1996) (holding that "[w]hen analyzing questions of federal law, the transferee court should apply the law of the circuit in which it is located"); Newton v. Thomason, 22 F.3d 1455, 1460 (9th Cir. 1994) (same); Menowitz v. Brown, 991 F.2d 36, 40-41 (2d Cir. 1993) (same).[4]

---

[4]    The Seventh Circuit has also agreed, in dicta, in the factually dissimilar case of Eckstein v. Balcor Film Investors, 8 F.3d 1121 (7th Cir. 1993), with the reasoning of the D.C. Circuit.  Eckstein involved a question of the appropriate statute of limitations for a claim of fraud arising under § 10(b) of the Securities Exchange Act of 1934.   The case involved two sets of plaintiffs, both of whom filed their action before 1990.  When the litigation began, federal courts throughout the country derived the periods of limitations in § 10(b) cases from state law.  See

We find the reasoning of the D.C., Second, Eighth, and Ninth Circuits

persuasive.  Since the federal courts are all interpreting the same federal law,

uniformity does not require that transferee courts defer to the law of the transferor

circuit.  Therefore, we conclude that the law of the Eleventh Circuit, rather than the

Eckstein, 8 F.3d at 1124.  However, in July 1990, the Seventh Circuit overruled its opinions that had looked to state law and held that § 13 of the Securities Act of 1933 supplied the proper statute of limitations for § 10(b) fraud claims.  See Short v. Belleville Shoe Manufacturing Co., 908 F.2d 1385 (7th Cir. 1990).  In June 1991, the Supreme Court  agreed with the Seventh Circuit that the federal securities laws are the proper source of the period of limitations but selected § 9(e) of the Securities Exchange Act of 1934 as the most appropriate rule.  See Lampf,Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364 n. 9, 111 S.Ct. 2773, 2782 n.9, 115 L.Ed.2d 321 (1991).  Congress responded to Lampf by enacting stopgap legislation which provided that the proper period of limitations for cases filed on or before June 19, 1991, was the limitation period provided by the laws in the applicable jurisdiction as those law existed on June 19, 1991.  See  Eckstein,  8 F.3d at 1124 (quoting § 27A of the '34 Act, 15 U.S.C. § 78aa-1(a)).  The district court in Eckstein held that under the stopgap legislation provided by § 27A, the law of the Seventh Circuit as stated in Short should control the statute of limitations imposed on both the plaintiffs who filed originally in the Seventh Circuit and those who filed originally in the Ninth Circuit.  See Majeski v. Balcor Entertainment Co. Ltd., 786 F. Supp. 1458, 1461 (E.D. Wis. 1992).

On appeal, the Seventh Circuit faced the question of the proper application of § 27A to transferred cases.  The Seventh Circuit agreed with the D.C. Circuit's reasoning in In re Korean Air Lines that a transferee court should normally use its own best judgment about the meaning of federal law when evaluating a federal question.  According to the court, "A single federal law implies a national interpretation.  Although courts of appeals cannot achieve this on their own, the norm is that each court of appeals considers the questions independently and reaches its own decision, without regard to the geographic location of the events giving rise to the litigation." Eckstein, 8 F.3d at 1126.  The court concluded, however, that Congress' stopgap legislation required a different result in this case.  The Seventh Circuit held that § 27A required them to apply the statute of limitations of the Seventh Circuit to the plaintiffs who filed originally in Wisconsin and the statute of limitations of the Ninth Circuit to the plaintiffs who filed originally in California as those laws existed on June 19, 1991.  Id. at 1127-28.  Unlike in Eckstein, there is no Congressional mandate in the present case instructing us to depart from the usual rule that a court of appeals must apply its own interpretation of federal law.

14

law of the D.C. Circuit, regarding the continued viability of the D'Oench, Duhme doctrine, was properly applied in this case.

## B.

Second, Murphy argues that even if the law of the Eleventh Circuit should, in general, be applied to cases transferred here, the previous holding of the D.C. Circuit in this case--that the D'Oench, Duhme doctrine has been preempted by the FIRREA-- binds this Court as "law of the case." "[L]aw of the case is an amorphous concept." Arizona v. California, 460 U.S. 605, 518, 103 S.Ct. 1383, 1391, 75 L.Ed.2d 318 (1983). The doctrine provides that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Id; see also Robinson v. Parrish, 720 F.2d 1548, 1549-50 (11th Cir. 1983). The purpose of the doctrine is to bring an end to litigation by foreclosing the possibility of repeatedly litigating an issue already decided. See Wheeler v. City of Pleasant Grove, 746 F.2d 1437, 1440 (11th Cir. 1984); United States v. Williams, 728 F.2d 1402, 1406 (11th Cir. 1984) Robinson, 720 F.2d at 1550. The law of the case doctrine does not, however, require rigid adherence to rulings made at an earlier stage of a case in all circumstances. See Robinson, 720 F.2d at 1550. The doctrine "directs a court's discretion, it does not limit the tribunal's power." Arizona, 460 U.S. at 618; see also DeLong Equip. Co.

15

v. Washington Mills Electro Minerals Corp., 990 F.2d 1186, 1196 (11th Cir. 1993) (noting that the doctrine "'is not an inexorable command that rigidly binds the court to its former decisions, but rather is an expression of good sense and wise judicial practice'") (quoting Terrell v. Household Goods Carriers' Bureau, 494 F.2d 16, 19 (5th Cir. 1974)).  Both the Supreme Court and this Circuit have made clear that reconsideration of a prior holding is not improper if the court is convinced that the prior decision is clearly erroneous and would work manifest injustice.  See Arizona, 460 U.S. at 619 n.8, 103 S.Ct. at 1391 n.8; Wheeler, 746 F.2d at 1440 (citing United States v. Robinson, 690 F.2d 869, 872 (11th Cir. 1982)).  Such is the case here.  We have explicitly rejected, in both Motorcity I and Motorcity II, the D.C. Circuit's prior ruling regarding the preemption of the D'Oench, Duhme doctrine.  We are not, therefore, bound by the "law of the case" doctrine to adhere to a ruling with which we have emphatically and repeatedly disagreed.

C.

Third, Murphy argues that even under current Eleventh Circuit law the D'Oench, Duhme doctrine should not be applied in this particular case because, Southeast, unlike the vast majority of FDIC receiverships, generated a $150 million surplus.  Murphy suggests that because, under 12 U.S.C. § 1821(d)(11)(B),

16

the bank's shareholders are allowed to divide funds remaining in a receivership pool after the creditors have been paid in full, applying the D'Oench, Dhume doctrine in this case would unfairly allow Southeast's shareholders to benefit from Murphy's loss. Murphy contends that allowing the bank's shareholders to divide what remains of his lost investment is contrary to notions of equity.

Murphy can point us to no case law, however, saying or even suggesting that the D'Oench, Duhme doctrine does not apply in cases where the receivership has generated a surplus. Rather, Murphy cites cases favoring the use of corporate assets to discharge debts before corporate stockholders are paid. See Bankers Trust Co. v. Florida East Coast Ry. Co., 31 F. Supp. 961, 964 (S.D. Fla. 1940) (ordering preferential payment by receivers of defendant railroad of previously entered judgment awarding plaintiff damages for the wrongful death of her husband); Hoyt v. Hampe, 214 N.W. 718, 719 (Iowa 1927) (explaining that "[t]he stockholders of a corporation are not entitled to a distribution of the assets among themselves while corporate debts remain unpaid"). Neither of these cases involve the FDIC as a party, and they do not implicate or shed light on the applicability of the D'Oench, Duhme doctrine in cases of surplus.[5]

_____

[5] The third case Murphy cites in support of his surplus argument, First Interstate Bank of Texas, N.A. v. First National Bank of Jefferson, 928 F.2d 153 (5th Cir. 1991), also does not involve the D'Oench, Duhme doctrine and merely underscores the inapplicability of these cases to the question at hand. In First Interstate Bank the court expressly states that "[t]he D'Oench,

17

As we explained in <u>Motorcity I</u>, the purpose of the <u>D'Oench, Duhme</u> doctrine is to ensure that the FDIC can rely on the records of a failed bank to determine quickly whether to engage in a purchase and assumption transaction, or whether to liquidate the failed bank and pay off insured deposits. <u>Motorcity I</u>, 83 F.3d at 1324. "Neither the FDIC nor state banking authorities would be able to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions." <u>Motorcity I</u>, 83 F.3d at 1325. Permitting the doctrine to be overidden if a receivership generates a surplus in the future undermines the doctrine's purpose of enabling the FDIC to make informed and accurate evaluations of a failed bank's assets and liabilities at the <u>outset</u> of the receivership in order to determine the best way to manage the bank's losses. Indeed the rationale of <u>D'Oench, Duhme</u>--to protect the FDIC from enforcement of oral agreements against failed financial institutions--is no less compelling if the failed institution eventually generates a surplus. The exception Murphy favors would eviscerate the doctrine. We conclude, therefore, that neither precedent nor the doctrine's purpose counsel in favor of creating an exception to the application

<hr>

<u>Duhme</u> doctrine protects the FDIC, not a solvent bank. The district court correctly declined to extend the doctrine to this case in which the FDIC is not a party." <u>Id.</u>, 928 F.2d at 156.

of the D'Oench, Duhme doctrine for cases in which a receivership generates a surplus.

D.

Finally, Murphy argues that the D'Oench, Dhume doctrine is no longer good law because it has been supplanted by the FIRREA. Murphy argues that the Supreme Court's decisions in O'Melveny & Myers v. FDIC, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), and Atherton v. FDIC, 519 U.S. 213, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997), require such preemption. Our Circuit has already spoken clearly on this issue rejecting precisely this claim.

In O'Melveny & Myers, the FDIC, as receiver of a failed California savings and loan (S & L), brought a malpractice lawsuit against the savings and loan's former law firm, pleading causes of action under California law for professional negligence and breach of fiduciary duty. Id., 512 U.S. at 82, 114 S.Ct. at 2052. The FDIC alleged that the law firm failed to inform the S & L of the illegal acts of the S & L's controlling officers. Id. The law firm defended by arguing that, under California law, knowledge of the conduct of the S & L's controlling officers must be imputed to the S&L, and hence to the FDIC, which, as receiver, stood in the S & L's shoes. Id. The FDIC urged the Court to create a new federal common law rule to govern the imputation of knowledge to the FDIC. Id. at 83, 114 S.Ct. at 2052.

19

The Court declined to do so.   First, the Court explained that, by statute, California, rather than federal common law, governed imputation of corporate officers' knowledge to the FDIC.  The Supreme Court noted that 12 U.S.C. § 1821(d)(2)(A)(i), as amended by the FIRREA, "places the FDIC in the shoes of the insolvent S & L, to work out its claims under state law, except where some provision in the extensive framework of FIRREA provides otherwise."  Id., at 87, 114 S.Ct. at 2054.  Moreover, the Court explained that even if the FIRREA was not applicable in the present case this was not a case "in which judicial creation of a special federal rule would be justified." Id. at 87, 114 S.Ct. at 2055.[6]

In Atherton, the Resolution Trust Corporation (later replaced by the FDIC) sued several officers and directors of the failed City Federal Savings Bank claiming that they had violated the legal standard of care they owed that federally insured institution.  Id., 519 U.S. at 215, 117 S.Ct. at 668.   The Supreme Court addressed the question of where courts should look to find the standard of care against which to measure the legal propriety of the defendants' conduct--to state law, to federal common law, or to a provision of the FIRREA, 12 U.S.C. §

---

[6]   The Court explained that the creation of federal common law was justified only in those limited situations where "there is a 'significant conflict between some federal policy or interest and the use of state law.'" O'Melveny, 512 U.S. at 87, 114 S.Ct. at 2054 (quoting Wallis v. Pan American Petroleum Corp., 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966)).

1821(k).  Id. at 215-216, 117 S.Ct. at 669.  The district court had held that the federal statute, § 1821, provided the appropriate standard of care.  Id. at 216, 117 S.Ct. at 669.  The Court of Appeals for the Third Circuit reversed holding that the federal statute provided only a baseline level of care but did not prohibit actions resting upon stricter rules originating in either state law or in federal common law.  Id. at 217, 117 S.Ct. at 669.  The Supreme Court vacated the Third Circuit opinion.  As an initial matter the Court held that the federal common law corporate governance standards articulated by the Court in Briggs v. Spaulding, 141 U.S. 132, 11 S.Ct. 924, 35 L.Ed. 662 (1891), did not survive the Court's later decision in Erie R. Co. v. Tompkins.  Id., at 226, 117 S.Ct. at 674.  As a result, the Court made clear: "There is no federal common law that would create a general standard of care applicable to this case."  Id.  The Court then went on to consider whether federal statute, 12 U.S.C.  § 1821, or state law provided the appropriate standard of care in the case.  The Supreme Court held that the federal statute's "gross negligence" standard provided a floor, but did not stand in the way of a stricter state-law standard making directors and officers liable for less egregious conduct.  Id. at 227, 117 S.Ct. at 674.

In Motorcity I and Motorcity II we ruled decisively and en banc that the Supreme Court's decisions in O'Melveny and Atherton did not abrogate our prior

21

holdings regarding the continued viability of the D'Oench, Duhme doctrine. We explained that both O'Melveny and Atherton dealt with the question of whether to create new federal common law in particular areas rather than with the question of whether Congress intended the FIRREA to supplant "the previously established and long-standing federal common law D'Oench doctrine." Motorcity II, 120 F.3d at 1143; see also Motorcity I, 83 F.3d at 1330. In Motorcity II, our affirmation of the D'Oench, Duhme doctrine in light of the FIRREA and the Supreme Court's decisions in O'Melveny and Atherton was explicit:

> [W]e decline to accept Motorcity's invitation to overrule D'Oench. With the D'Oench doctrine safely in place as a long-standing federal common law rule, we conclude that the appropriate analysis for the statutory abrogation issue presented in this case is that articulated in United States v. Texas,[7] and not that articulated in Atherton and O'Melveny. We continue to believe that the analysis set forth in our prior en banc opinion reflects the most reasonable reading of Congress's intent--i.e., that Congress did not intend FIRREA to displace the D'Oench doctrine, but rather intended to continue the harmonious, forty-year coexistence of the statute and the D'Oench doctrine.

---

[7] In United States v. Texas, 507 U.S. 529, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993), the Supreme Court noted the "longstanding . . . principle that '[s]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.'" Id. 507 U.S. at 524 (quoting Isbrandtsen Co. v. Johnson, 343 U.S. 779, 783, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952)). The Court held that "[i]n order to abrogate a common-law principle, the statue must 'speak directly' to the question addressed by the common law." Id. (citing Mobil Oil Corp. v. Higginbotham, 436 U.S. 618, 625, 98 S.Ct. 2010, 2015, 56 L.Ed.2d 581 (1978); Milwaukee v. Illinois, 451 U.S. 304, 315, 101 S.Ct. 1784, 1791, 68 L.Ed.2d 114 (1981)).

Id., 120 F.3d 1140, 1144. This panel is bound by the Circuit's prior en banc decision. See Chambers v. Thompson, 150 F.3d 1324, 1326 (11th Cir. 1998) (noting that "[w]e are bound to follow a prior panel or en banc holding, except where that holding has been overruled or undermined to the point of abrogation by a subsequent en banc or Supreme Court decision").

Therefore, under the D'Oench, Duhme doctrine, Murphy has failed to state a claim against the FDIC because he has not alleged a written agreement between Southeast and Orchid establishing their joint venture relationship, the D'Oench, Duhme doctrine remains good law in this Circuit, and there is no sound reason not to apply the doctrine in this case. Accordingly, we affirm the district court's order dismissing Murphy's complaint.[8]

AFFIRMED.

---

[8] In view of this ruling, we need not address the district court's alternative grounds for dismissal.

23