Steven Swafford appeals from a judgment determining that he does not have standing to seek a judicial declaration that Ruben Myers, deceased, was his biological father. We affirm.
On October 27, 2005, Ruben Myers executed a will leaving his entire estate to his sister, Nell Myers Norton, and naming his brother-in-law, Kenneth E. Norton, as the executor of his estate. Ruben died almost three weeks later, on November 15, 2005. On January 12, 2006, Ruben's will was admitted to probate and the Cleburne Probate Court issued letters testamentary to Kenneth E. Norton. On the same day, Steven Swafford filed in the probate court a petition for determination of heirship, alleging that his mother, Linda Swafford, had had a relationship with Ruben that resulted in her becoming pregnant with and giving birth to Steven.
On February 6, 2006, the probate court transferred the administration of Ruben's estate to the Cleburne Circuit Court. On March 8, 2006, Steven filed in the circuit court a petition to exhume Ruben's body in order to conduct DNA testing. The petition alleged that Steven and his mother's husband, Billy Swafford, had undergone DNA testing that demonstrated a "zero percent probability" that Billy was Steven's *Page 22 
father. Attached to the petition was an affidavit of Linda Swafford averring, in pertinent part, the following:
 "3. I am married to Billy Swafford. We were married on the 27th day of August, 1955.
 "4. I am the mother of Steven Swafford, whose date of birth is July 30, 1970.
 "5. While married to Billy Swafford, I was employed by Ruben A. Myers in his Plumbing 
Heating/Furniture business. I served as a secretary.
 "6. During the time of my employment with Ruben Myers, I had some rocky times in my marriage. I was looking for affection. Mr. Myers offered affection to me. We had sexual relations multiple times over a period of thirty-six (36) months.
 "7. To the best of my knowledge, I became pregnant by Ruben Myers. I had no other relationship with a man other than with my husband, Billy Swafford, and with Ruben Myers at any time during the time prior to my pregnancy and subsequent birth of Steven Swafford.
 "8. I have read a LabCorp lab report that indicates that there is a 0% chance that Billy Swafford is the father of Steven Swafford. Accordingly, with my having no sexual relationship other than with Billy Swafford and with Ruben Myers that would have produced a child, I am informed and believe that Ruben Myers is the biological father of Steven Swafford.
 "9. I am willing to participate in any medical testing to establish if Steven is the son of me and Ruben Myers."
Kenneth E. Norton, as executor of Ruben's estate (hereinafter "the estate"), filed an objection to Steven's petition to exhume Ruben's body and a motion to strike Linda's affidavit, arguing that, pursuant to § 26-17-5(a)(1), Ala. Code 1975, Billy Swafford was Steven's presumed father and that, pursuant to § 26-17-5(b), Ala. Code 1975, that presumption could be overcome only by clear and convincing evidence. Citing Curryv. Curry, 402 So.2d 1019, 1020 (Ala.Civ.App. 1981), the estate also asserted that Linda was incompetent to testify that Steven was illegitimate.[1] Circuit Judge John C. Thomason conducted a hearing on the petition for exhumation on April 25, 2006, at which time the parties stipulated to the admissibility of the results of the DNA paternity testing conducted on Steven and Billy. The court heard the testimony of Steven, Linda, and Billy, as well as the testimony of Jerry Brown, a witness to Ruben's will.
Steven testified that he had known Ruben Myers all of his life. Ruben had never married. Steven said that Ruben had paid for his college education and had loaned him the money to purchase the two houses that he had bought during his adult life. He identified photographs depicting Ruben as a participant in family Christmas and birthday celebrations with Steven and his parents, Linda and Billy, and with Steven and his daughter. Steven described rambles in the woods with Ruben and discussions that, he said, the two had had about building a cabin together. Steven testified that people often remarked on his physical resemblance to Ruben. He said that he and his son had visited Ruben "quite often" to ride four-wheel all-terrain vehicles on Ruben's property. Steven stated that, on one of those occasions, Ruben had *Page 23 
shown him an old black-and-white photograph of the Myers family, depicting Ruben as a young boy. Steven testified that he bore a "striking resemblance" to the photograph of Ruben, "to the point that it was really odd." He said that he had previously wondered whether Ruben was his father but that that occasion had marked "the first time that [Ruben's being his father] could be a real possibility." Steven said, however, that when he asked his mother whether there was "something here [that he] didn't know about," she assured him that "there wasn't."
During Ruben's final illness, Steven visited Ruben at the hospital and at Nell Norton's home. On Steven's last visit shortly before Ruben's death, Ruben had been unable to speak but, Steven said, Ruben had held his hand and would not release it when Steven indicated that it was time to end the visit. Steven testified that "[Ruben] kept flipping [Steven's] hand over and twisting it" and brought Steven's hand to his open palm. Steven said that, at that point, "the suspicion that [he] had written off in the past was something that was real. It wasn't just something to think about."
Steven testified that he could not get the incident out of his mind and that, at 11:30 that night, he telephoned his mother and told her that he needed to see her immediately. He drove to his mother's home, his mother came out to his vehicle, and the two went for a drive, during which time his mother told him the truth. Steven said that, "after a significant deliberation of the issue, [his] mother spoke with [Billy] about it in January of 2006."
Linda testified that she and Ruben were involved in a sexual relationship during the fall of 1969 when Steven was conceived. She said that she and Ruben had kept their affair a secret and had never divulged to either Steven or to her husband Billy the facts surrounding Steven's conception. She explained:
 "I didn't want to break up my home. I didn't want my husband to know about it. He didn't know anything about this. He thought Steven was his son. I just didn't want my home to be [torn] up. I didn't want my children — That's the reason I didn't marry Ruben."
Linda testified that a short time before Ruben died Steven came to her and asked whether Ruben was his father. She continued:
 "Steven said he wanted to know the truth. And I was upset because Ruben was sick . . . I cared a lot for Ruben. And I was upset about it. And I just thought Steven should know the truth and Ruben had asked me during the summer to tell Steven."
On cross-examination, when Linda was asked why, if Ruben knew that Steven was his son, he had made no provision for Steven in his will, Linda answered, "I asked [Ruben] not to do anything that would let Billy know."
Billy testified that he was married to Linda and that he had two children, Debra and Sheila. In answer to the question, "Are you saying that Steven is not your son?" Billy said "yes."
The estate filed a brief arguing that Steven lacked standing — under either the Probate Code, specifically § 43-8-48(2)(b), Ala. Code 1975, or the Alabama Uniform Parentage Act ("the AUPA"), specifically § 26-17-5(a)(1) and § 26-17-6(c), Ala. Code 1975 — to bring an action to establish that Ruben was his father. Section 43-8-48 provides:
 "If for purposes of intestate succession, a relationship of parent and child must be established to determine succession by, through, or from a person: *Page 24 
 "(1) An adopted person is the child of an adopting parent and not of the natural parents except that adoption of a child by the spouse of a natural parent has no effect on the right of the child to inherit from or through either natural parent;
 "(2) In cases not covered by subdivision (1) of this section, a person born out of wedlock is a child of the mother. That person is also a child of the father, if:
 "a. The natural parents participated in a marriage ceremony before or after the birth of the child, even though the attempted marriage is void; or
 "b. The paternity is established by an adjudication before the death of the father or is established thereafter by clear and convincing proof, but the paternity established under this paragraph is ineffective to qualify the father or his kindred to inherit from or through the child unless the father has openly treated the child as his, and has not refused to support the child."
(Emphasis added.) Section 26-17-5(a)(1) provides:
 "(a) A man is presumed to be the natural father of a child if any of the following apply:
 "(1) He and the child's natural mother are or have been married to each other and the child is born during the marriage. . . ."
Section 26-17-6(c) provides:
 "An action to determine the existence of the father and child relationship with respect to a child who has no presumed father under Section 26-17-5 may be brought by the child. . . ."
On May 12, 2006, Judge Thomason granted Steven's petition to exhume Ruben's body. On July 7, 2006, Steven filed a complaint contesting Ruben's will. Within a week of that filing, two other will contests were filed by some of Ruben's nieces and nephews, the children of Ruben's deceased siblings. On October 3, 2006, Steven moved the court for a declaration of paternity; on November 7, 2006, the estate filed a motion in opposition. In February 2007, the case was reassigned from Judge Thomason to Judge Brian P. Howell.
On February 7, 2007, Steven moved for a summary judgment on his declaration-of-paternity action, accompanied by a brief in support of the motion and documents indicating that DNA tests conducted by LabCorp of Burlington, North Carolina, had revealed a 99.99% probability that Ruben was Steven's father. The estate also moved for a summary judgment, attaching a supporting brief and evidentiary matter in support of that motion and in opposition to Steven's motion. The attachments included Steven's birth certificate bearing the name "Billy Swafford" as Steven's father.
On March 14, 2007, Judge Howell held a hearing on the pending motions. Steven requested that Judge Howell take judicial notice of the fact that the paternity-test results excluding Billy as his father had been admitted by stipulation at an earlier hearing conducted by Judge Thomason. He also requested that Judge Howell take judicial notice of Linda's earlier testimony in the case. The court agreed to take notice of both evidentiary matters. Steven, however, did not ask Judge Howell to notice Billy's earlier testimony disclaiming his paternity of Steven.
At the March 14 hearing, Dr. George Maha, director of the DNA Identification Testing Division of LabCorp, explained the process used to arrive at the paternity-test results in this case, authenticated various documents relating to the testing procedure, *Page 25 
and stated that there was a 99.99% probability that Ruben was Steven's father.[2] The documents about which Dr. Maha testified were admitted in evidence without objection. The court then heard arguments from both sides concerning whether Steven had standing to establish that Ruben was his father.
Steven argued that the issue of standing had already been decided adversely to the estate when Judge Thomason granted Steven's motion to exhume Ruben's body. He maintained that the estate could not raise the issue again because it had neither moved Judge Thomason to reconsider his ruling nor appealed Judge Thomason's decision. Steven asserted that, in reliance upon Judge Thomason's ruling, he had carried out the exhumation process and expended a great deal of money to have genetic testing performed. He argued that the estate should be deemed to have waived or should be estopped to assert the standing issue. The estate argued that Judge Thomason's exhumation order was not a final judgment that could have been appealed and that the order was, therefore, open to being reconsidered by Judge Howell.
The estate argued that Steven did not have standing under § 43-8-48(2)(b) because, it said, that statute applies only to intestacy and Ruben died testate. Steven countered that, if the will contests were successful, Ruben's estate would be administered as an intestate estate. The estate argued that Steven had waived the argument that he had standing under either § 43-8-48 or § 26-17-6 by acknowledging that he did not "fit squarely" within the provisions of either statute and by requesting the court to employ equitable principles to "fill the gaps" in the statutes and to determine that he had established standing.
On March 16, 2007, Judge Howell entered the following judgment:
 "This matter having come before the Court on a Motion for Declaration of Paternity on March 14, 2007 and testimony being heard. The [estate] alleges that [Steven] lacks standing to assert this paternity action because no provisions of law avail him of protection. The [estate] points out Code of Alabama § 43-8-48 applies to situations of a child born out of wedlock who wishes to establish paternity in cases of intestate succession and claims that [Steven] is not entitled to relief under this section for several reasons. Additionally, the [estate] argues [that Steven] is not entitled to relief under the Uniform Parentage Act (UPA), § 26-17-6, Code of Alabama because there is no presumed father-child relationship. [Steven] concedes that he may not fit perfectly into either of the above-cited statutes, but encourages this Court to allow this case to proceed under an equitable argument citing Smith v. Roney, 182 Ala. 540, 62 So. 753 (Ala. 1913) and its language stating, `It is, of course, a truism that the system of equity jurisprudence *Page 26 
was formed for the purpose of supplementing the law and of furnishing remedies for wrongs for which the law was, by reason of the unbending and inflexible character of its rules, unable to furnish a remedy.' Smith[, 182 Ala. at 543-44, 62 So.] at 754. [Steven] argues that should this Court deny him his opportunity to prove paternity and to later contest the will [it] would be an injustice to him and would be an inequitable result.
 "This Court agrees that equity does have a part in the courts today and may be invoked to remedy an inequitable situation when there exists no present or past opportunity to obtain relief. The Court also recognizes the equitable concept of `clean hands.' Counsel for [Steven] mentioned in his argument that one who comes into equity must come with clean hands and that one who does not possess clean hands may in essence waive any later objection they may have to challenge a decision. While this was offered in relation to the argument about the exhumation of the decedent and whether the [estate] had thereby waived any present right to challenge [Steven's standing] due to its failure to previously make this legal argument, this Court finds it has application to the present challenge of paternity. The Courts of Alabama have continually recognized that one `who seeks equity must do equity and one that comes into equity must come with clean hands.' The purpose of the clean hands doctrine is to prevent a party from asserting his, her, or its rights under the law when that party's own wrongful conduct renders the assertion of such rights contrary to equity and good conscience. J M Bail Bonding v. Hayes, 748 So.2d 198, 199
(Ala. 1999).
 "The evidentiary submissions made in support of the arguments are clear that [Steven] was made aware by his mother some time before the death of Ruben Myers that Mr. Myers was his biological father. That has not been disputed. [Steven] made no attempt while Ruben Myers was alive to establish paternity and made no attempts to establish a father-son relationship. If Ruben Myers was the father as has been offered by [Steven] through DNA testing and from sworn testimony of [Steven's] mother, Linda Swafford, Mr. Myers made no efforts to establish a father-son relationship. It is only after the death of Ruben Myers when [Steven] could possibly be the heir to Ruben Myers's estate does he come forth to establish paternity. [Steven] fails to come before this Court with clean hands in [his] request for this Court to invoke equity.
 "This Court finds that [Steven] does not have standing under any provision of the law of Alabama to assert or establish paternity in this case. The request by [Steven] for a Declaration of Paternity is hereby DENIED."
On appeal, Steven makes three arguments: (1) that the circuit court erred in determining that it was not bound, under the doctrine of the law of the case, by Judge Thomason's May 12, 2006, order granting Steven's petition for exhumation, an order that, Steven says, necessarily decided the issue of standing in his favor; (2) that the circuit court erred in determining that Steven had no standing, "under any provision of the law of Alabama," to seek a determination that Ruben Myers was his father; and (3) that the circuit court erred in applying the unclean-hands doctrine based on Steven's failure to seek a paternity determination before Ruben's death.
 Standard of Review
Appellate review of a summary judgment is de novo. Ex parteBallew, *Page 27 771 So.2d 1040 (Ala. 2000). A motion for a summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. A party moving for a summary judgment must make a prima facie showing "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Rule 56(c)(3); see Lee v. City ofGadsden, 592 So.2d 1036, 1038 (Ala. 1992). If the movant meets this burden, "the burden then shifts to the nonmovant to rebut the movant's prima facie showing by `substantial evidence.'" Lee, 592 So.2d at 1038 (footnote omitted). "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. ofFlorida, 547 So.2d 870, 871 (Ala. 1989); see
§ 12-21-12(d), Ala. Code 1975.
 Law of the Case
In Ex parte Discount Foods, Inc., 789 So.2d 842, 846
n. 4 (Ala. 2001), the Alabama Supreme Court explained that applying the law-of-the-case doctrine to an issue decided on a prior appeal of the same case is not obligatory:
 "Generally, the law-of-the-case doctrine provides that when a court decides upon a rule of law, that rule should continue to govern the same issues in subsequent stages in the same case. The purpose of the doctrine is to bring an end to litigation by foreclosing the possibility of repeatedly litigating an issue already decided. See Murphy v. FDIC, 208 F.3d 959 (11th Cir. 2000); see, also, Blumberg v. Touche Ross Co., 514 So.2d 922
(Ala. 1987). However, the law-of-the-case doctrine does not in all circumstances require rigid adherence to rulings made at an earlier stage of a case.
 The doctrine directs a court's discretion; it does not limit a court's power. The law-of-the-case doctrine is one of practice or court policy, not of inflexible law, and it will be disregarded when compelling circumstances call for the redetermination of a point of law on a prior appeal; and this is particularly true when the court is convinced that its prior decision is clearly erroneous or where an intervening or contemporaneous change in the law has occurred by an overruling of former decisions or when such a change has occurred by new precedent established by controlling authority."
Applying the law-of-the-case doctrine to an interlocutory order of a different judge at an earlier stage of the trial court proceedings in the same case is even less essential.
 "`A judge is not bound to follow the decisions of another judge made at an earlier stage of the proceedings, and if the same point is again raised he has the same right to reconsider the question as if he had himself made the original decision.' Santoro v. Kleinberger, 115 Conn. 631, 638, 163 A. 107
(1932). . . . `According to the generally accepted view, one judge may, in a proper case, vacate, modify, or depart from an interlocutory order or ruling of another judge in the same case, upon a question of law.' 46 Am.Jur.2d, Judges § 46; [W.W. Allen, Annotation, Interlocutory Ruling or Order of one Judge as Binding on Another in Same Case], 132 A.L.R. 14, 49 [(1941)]."
Breen v. Phelps, 186 Conn. 86, 98-99,439 A.2d 1066, 1075 (1982).
Moreover, because the issue of standing implicates a court's subject-matter jurisdiction, see State v. Property at 2018Rainbow Drive, 740 So.2d 1025, 1028 (Ala. 1999), "`standing is a jurisdictional *Page 28 
prerequisite to every case and may be raised at any stage of the proceedings.'" Id. (quoting Romer v. Board ofCounty Comm'rs of the County of Pueblo, 956 P.2d 566, 585
(Colo. 1998) (Martinez, J., dissenting)).
We conclude that, to the extent that Judge Thomason's exhumation order represented a determination that Steven had standing to seek a ruling that Ruben was his father, that order was interlocutory and subject to revision by Judge Howell.See Rule 54(b), Ala. R. Civ. P. (stating that "in the absence of [a] determination [of no just reason for delay] and direction [of a final judgment], any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision issubject to revision at any time before the entry of judgmentadjudicating all the claims and the rights and liabilities ofall the parties" (emphasis added)).
 Standing
Although Steven asserted in the circuit court that the Probate Code, specifically § 43-8-48(2)(b), affords him the right to seek a declaration of paternity, he does not make that assertion on appeal and he has, therefore, abandoned his argument with respect to § 43-8-48. See Rule 28(a)(10), Ala. R.App. P. Instead, he argues that he has standing under either the AUPA, specifically § 26-17-6(c), or general equitable principles.
With respect to standing under the AUPA, Steven argues that he has standing under § 26-17-6(c) because Billy, who was his presumed father pursuant to § 26-17-5(a)(1), disclaimed his paternity of Steven at the hearing conducted by Judge Thomason on April 25, 2006. In a long line of cases beginning with Exparte Presse, 554 So.2d 406 (Ala. 1989), Alabama appellate courts have held that no one has standing to challenge a presumed father's parentage "so long as the presumed father persists in maintaining his paternal status."554 So.2d at 418 (emphasis added). See B.N.P. v. D.M.P.,896 So.2d 505, 509 (Ala.Civ.App. 2004) (stating that a child "does not have standing under the AUPA to challenge the presumed father's paternity so long as [the presumed father] persists in claiming paternity"). See also J.O.J. v. R.R.,895 So.2d 336 (Ala.Civ.App. 2004); M.M.E. v. B.E.,864 So.2d 351 (Ala.Civ.App. 2002); Hooten v. Hooten,754 So.2d 634, 635 (Ala.Civ.App. 1999); and Ex parte CAP.,683 So.2d 1010, 1011 (Ala. 1996). Cf. D.S.M. v. L.M.,854 So.2d 1140 (Ala.Civ.App. 2002) (holding that a child was not barred by a former statute of limitations applicable to actions to establish the existence of a father and child relationship when the current action was to establish the nonexistence of a father and child relationship and the presumed father no longer persisted in maintaining paternity).
Steven, however, did not present the disclaimer-of-paternity argument to Judge Howell; he makes the argument for the first time in his appellate brief. Nor did he present, in support of his motion for a summary judgment, evidence indicating that Billy had disclaimed his paternity of Steven. Although Steven asked Judge Howell to take notice of other evidentiary matters that had been presented at the April 25, 2006, hearing before Judge Thomason, Steven neither directed Judge Howell's attention to Billy's testimony, nor attached a transcript of that testimony to his motion for a summary judgment, nor referred to that testimony in his brief in support of the summary-judgment motion. Consequently, Steven failed to carry his burden as the movant for a summary judgment *Page 29 
to establish that there was no genuine issue as to any material fact and that he was entitled to a judgment as a matter oflaw. Rule 56(c)(3), Ala. R.App. P.
The estate, on the other hand, made a prima facie showing that it was entitled to a judgment as a matter of law based on the undisputed fact that Steven was born during the marriage of his mother to Billy; that Steven, therefore, had a presumed father as a matter of law pursuant to § 26-17-5(a)(1); and, consequently, that Steven did not fall within § 26-17-6(c), which provides for "[a]n action to determine the existence of the father and child relationship with respect to a childwho has no presumed father under Section 26-17-5." At that point, the estate satisfied its Rule 56, Ala. R. Civ. P., burden of production because its proof was "`such that [it] would be entitled to a [judgment as a matter of law] if this evidence was not controverted at trial.'" Ex parte GeneralMotors Corp., 769 So.2d 903, 909 (Ala. 1999) (quotingBerner v. Caldwell, 543 So.2d 686, 691 (Ala. 1989) (Houston, J., concurring specially)). In fact, Steven did not controvert the estate's showing by going forward with evidence indicating that he did fall within the provisions of § 26-17-6(c), because Billy, his presumed father, had disclaimed his paternity.
With respect to Steven's equitable-standing argument, our supreme court has made it clear in a different but analogous context that, when the legislature has declared the policy of this state by a statutory enactment, the judiciary may not "disregard the clear statutory directive" under the guise of equity or public policy. Ellis v. West, 971 So.2d 20,22 (Ala. 2007). In Ellis, the court held that § 43-8-48(1) prohibited children who were adopted by their paternal grandmother after the death of their biological mother from inheriting from anyone in the biological mother's lineage. In answer to equitable and public-policy arguments by the children, the court stated:
 "`Our laws of descent and distributions are of statutory creation, and . . . the status of parent and child has always influenced legislative action in determining what shall become of the property of those who die intestate. . . .' Prince v. Prince, 188 Ala. 559, 560, 66 So. 27, 28 (1914) (emphasis added).
 "The legislature has unambiguously declared it to be the policy of this State that, except in one instance immaterial to this case, an adoption severs a child from its natural lineage for purposes of intestate succession. The wisdom or folly of that declaration is of no legitimate concern to the judiciary. The judiciary's duty is merely to enforce the policy as declared in § 43-8-48(1)."
971 So.2d at 22-23 (some citations and footnote omitted).
Because we hold that the circuit court correctly denied Steven's motion for a summary judgment and properly entered a summary judgment for the estate on the issue of standing, we need not address Steven's argument with respect to the circuit court's unclean-hands rationale.
The judgment of the Cleburne Circuit Court is affirmed.
AFFIRMED.
PITTMAN, BRYAN, and MOORE, JJ., concur.
THOMPSON, P.J., concurs in the result, without writing.
[1] The decision in Curry was superseded by the Alabama Uniform Parentage Act, Ala. Code 1975, § 26-17-1 et seq., which became effective on May 7, 1984. See Ala. Acts 1984, Act No. 84-244. See also Foster v. Whitley,564 So.2d 990 (Ala.Civ.App. 1990).
[2] Dr. Maha testified that the embalming process had destroyed Ruben's DNA; therefore, LabCorp had been unable to make a direct comparison of Ruben's DNA and Steven's DNA. He explained, however, that his laboratory had been able to make a reliable alternative comparison in the following way: (1) it analyzed the DNA of Ruben's nephews — Keith and Kelly Myers, the male children of Ruben's only brother, Sid Myers, who was deceased — and determined that Steven and the nephews shared a common male ancestor; (2) it ruled out Sid as the common male ancestor when it determined, from analyzing the DNA of Sid's wife and the DNA of Steven's mother, what "male traits" Steven and the nephews had in common; and (3) it concluded that there was a 99.99% probability that Ruben was the common male ancestor. *Page 30